MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:      2013 ME 36
Docket:        Yor-11-611
Argued:        October 23, 2012
Decided:       March 26, 2013

Panel:         SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

# STATE OF MAINE

v.

# THOMAS P. WOODARD

SAUFLEY, C.J.

[¶1]   Thomas P. Woodard, who operated a returnable bottle redemption center, was convicted of theft by deception (Class B), 17-A M.R.S. § 354(1)(B)(1) (2012), for turning over empty beverage containers that were not from beverages purchased in Maine and accepting deposit refunds and handling fees from Maine beverage distributors for those containers.   Woodard now appeals from the judgment, which was entered by the trial court (*Bradford, J.*) after a jury found him guilty.   Woodard argues that the evidence was insufficient to support the conviction; that the court erred in admitting evidence regarding bad acts committed outside the time alleged in the charging instrument; that the court abused its discretion in admitting certain photographs; that the prosecutor engaged in misconduct by asking the jury to "send a message"; and that the court erred in failing to give requested jury instructions.   We affirm the judgment.

2

## I.  THE MAINE BOTTLE BILL

[¶2]  Maine's bottle bill was enacted in 1976.  P.L. 1975, ch. 739, § 16 (effective Jan. 1, 1978) (codified as subsequently amended at 32 M.R.S. §§ 1861-1873 (2012)[1]).  The purpose of the legislation, as now codified, is to create incentives for manufacturers, distributors, dealers, and consumers of beverages sold in Maine to reuse or recycle beverage containers to decrease litter and waste.  *See* 32 M.R.S. § 1861(2).

[¶3]  By statute, most beverage containers sold or offered for sale in Maine "must have a deposit and refund value," *id.* §§ 1862(2), 1863-A, with the deposit to be charged to the consumer at the time of sale and refunded upon redemption. *See id.* §§ 1863-A, 1866.  Beverage distributors that sell beverages to dealers for retail sale to consumers in Maine bear the costs of the bottle bill.  *See id.* §§ 1862(5), (7), 1866(3), (4).  To comply with their obligations, the distributors pay per-bottle handling fees, established at a statutory minimum rate, to authorized redemption centers.  *Id.* § 1866(4).  In exchange, those redemption centers receive empty beverage containers from consumers, refund the consumers' deposits, and

---

[1]  Although these statutes have been amended in some ways since the events that gave rise to these criminal charges, *see, e.g.*, P.L. 2011, ch. 429, §§ 1-6 (effective July 1, 2012, for the amendment to section 1866(4)(C) and Sept. 28, 2011, for all other provisions) (codified at 32 M.R.S. §§ 1865, 1866, 1871-A, 1872 (2012)), those amendments are not relevant here, and we cite to the current codification of the statutes.

sort the containers for collection by the distributors or their agents. *See id.* §§ 1866(3)-(5), 1867.

[¶4] During the relevant course of time, the statutory minimum rate for handling fees ranged from three cents per container to three and one-half cents per container, depending on whether the containers were handled subject to a commingling agreement between manufacturers or distributors. *See id.* §§ 1862(2-A), 1866(4), 1866-D. The separate minimum deposit and refund value has, since the enactment of the bottle bill, been set at five cents for all containers other than wine and spirits containers. *See id.* § 1863-A(1) to (3).

[¶5] Pursuant to the bottle bill, distributors owe a refund to consumers only if the redeemed containers were "originally sold in this State as filled beverage containers." *Id.* § 1866(8). To protect against the redemption of containers from beverages sold to consumers outside of Maine, the redemption centers, which act on behalf of the distributors in issuing refunds, must post signs warning that fines may be imposed on those who tender bottles sold outside of Maine. *See id.* A redemption center is subject to civil penalties, and possibly license revocation, if it tenders to a distributor more than forty-eight containers that it knows or has reason to know were not originally sold in Maine. *See id.* §§ 1862(11), 1866(8), (9).

4

## II. BACKGROUND

[¶6] Woodard's wife owned, and Woodard operated, Green Bee Redemption in Kittery, Maine. The primary questions for the jury to consider in determining whether a crime had been committed were (1) did Woodard and his wife (who was also tried and ultimately acquitted) redeem certain customers' bulk container deliveries knowing that the containers were not originally sold in Maine as filled beverage containers and then seek handling fees and reimbursement for refunded deposits from distributors for these non-Maine containers, and (2) did the deposits and handling fees that they received from distributors for redeeming those containers reach felony theft levels. *See* 17-A M.R.S. § 354(1)(B)(1).

[¶7] Viewing the evidence admitted at trial in the light most favorable to the State, the jury could rationally have found the following facts beyond a reasonable doubt. *See State v. Haag*, 2012 ME 94, ¶ 2, 48 A.3d 207.

[¶8] The Department of Agriculture,[2] which is responsible for enforcing the bottle bill, *see* 32 M.R.S. §§ 1862(6), 1871-B to 1871-D, was tipped off to a possible scheme to redeem non-Maine beverage containers at Green Bee. Resulting surveillance revealed that, on Thursday, March 18, 2010, at about 7:00 p.m., Dennis Reed, the owner of Sports Zone, a large sports complex in

---

[2] At the relevant time, the Department was known as the Department of Agriculture, Food and Rural Resources; it is now the Department of Agriculture, Conservation and Forestry. *See* P.L. 2011, ch. 657, § W-5 (effective Aug. 30, 2012).

Derry, New Hampshire,[3] drove a sport utility vehicle away from Sports Zone pulling a trailer filled with large bags full of empty beverage containers. Reed drove the trailer filled with containers to Maine and parked in a lot behind a building located at 230 U.S. Route One Bypass, also known as 230 State Road, in Kittery. The building was located approximately a mile away from Green Bee. Reed exited his vehicle and moved all of the bags of containers from the trailer into a white box truck that was parked at that location. Reed then drove away but was soon pulled over by an officer of the Kittery Police Department. The contents of the white box truck were seized by the Department of Agriculture and placed in a truck supplied for the Department's use by National Distributors.

[¶9]   Based on a conversation with Reed, Randy Trahan, a consumer protection inspector from the Department of Agriculture's Division of Quality Assurance and Regulations, called Woodard on the telephone to inquire about the containers. Woodard did not answer but later returned Trahan's call, and the two men arranged to meet in person. At that meeting, Woodard admitted to Trahan that Reed would deliver containers to the white box truck and leave a receipt in the cab of the truck. Woodard referred to Reed as coming from New Hampshire.

[¶10]   Woodard admitted that Green Bee would pay Reed five cents per container by check for the bottles that he delivered. Although Woodard denied

---

[3]  New Hampshire does not have a bottle bill.

6

having spoken with Reed on the telephone on the day in question, telephone records that were subpoenaed showed calls between his mobile phone and Reed's on several occasions, including on that day, both before and after the interception of the containers.

[¶11]  Between April 2008 and February 2010, Green Bee received at least $3,787.38 in handling fees for bottles redeemed by Reed and by an out-of-state Green Bee employee named Thomas Prybot.  With the five-cent-per-bottle redemption amount calculated in, Maine distributors paid Green Bee a minimum of $10,099.68 for redeeming and handling those bottles.[4]

[¶12]  Woodard was charged by indictment with theft by deception (Class B), 17-A M.R.S. § 354(1)(B)(1).  He pleaded not guilty and proceeded to a jury trial.  During the four-day trial, the State offered testimony from those who had assisted in investigating Woodard's operations, including Trahan, the redemption recycling manager from Coca-Cola Bottling Company of Northern New England who conducted surveillance of Sports Zone in New Hampshire for Trahan, the Kittery Police Department officer who assisted in locating the trailer when it arrived in Kittery, and the driver supervisor for National Distributors who supplied the truck to pick up the intercepted containers.  The State also offered the

---

[4]  From the voluminous evidence presented at trial, the jury found that Woodard had committed theft of more than $10,000.  Even assuming that all of the bottles delivered by Reed and Prybot were subject to a commingling agreement and, therefore, generated only three cents per bottle in handling fees, the jury could have found that the total accepted from distributors or their agents for those bottles was $10,099.68.

testimony of a detective from the Attorney General's office who assisted in the investigation by obtaining through subpoena (1) bank records from Green Bee that showed several payouts to Reed and Prybot and (2) telephone records that demonstrated contact between Reed and the Woodards several times between 2007 and 2010, including between March 17 and 19, 2010.

[¶13]  The State offered testimony from employees of the New Hampshire Sports Zone and Green Bee.  An employee who began working at Sports Zone in February 2010 testified about container-sorting instructions at Sports Zone that called for setting apart those containers that, although likely purchased at Sports Zone or elsewhere in New Hampshire, had the proper markings for redemption in Maine.  Apparently, the containers from beverages sold at this New Hampshire facility were sorted in an effort to exclude containers that *could not* have been sold to consumers in Maine.  The Sports Zone employee also testified that he saw a trailer leave Sports Zone on one Thursday night each month with bags of bottles and then return empty.  Thomas Prybot, an employee of Green Bee, testified that he lived in Massachusetts but had received hundreds of dollars for redeemed bottles from Green Bee without having been questioned about where the beverages had been purchased.  Other Green Bee employees testified that that they rarely saw Woodard's wife at the redemption center and identified Woodard as the boss.

[¶14]   The State also offered evidence from professionals working in the bottle-redemption industry.  The chief financial officer of National Distributors testified that National Distributors had paid hundreds of thousands of dollars to Green Bee between 2008 and 2010 to reimburse Green Bee for deposits and to pay Green Bee a handling fee of three cents to three and one-half cents per container. A Pepsi Bottling Company employee who supervised redemption pick-up testified that Pepsi had picked up hundreds of thousands of containers and paid tens of thousands of dollars to Green Bee between April 2008 and February 2010.  An employee of Returnable Services, a container collection agency for about 300 distributors, testified that Returnable Services had paid Green Bee $134,000 between April 2008 and February 2010.  That employee also testified that several factors should be considered by redemption centers to determine if containers were not purchased in Maine: (1) the presence of out-of-state license plates on the delivering vehicle, (2) the customer's presorting of the bottles, (3) repeated business, (4) delivery outside normal business hours, and (5) delivery of a high volume of unusual beverage containers.

[¶15]   During the trial, the court admitted several documentary and photographic exhibits offered by the State, including a series of photographs of the containers that were seized.  Certain bottles were identified as bottles that were not sold anywhere in Maine at that time.  The court also admitted, over Woodard's

objection, photographs of the barn at Prybot's residence in Massachusetts where bottles were sorted. Woodard did not offer any testimonial or documentary evidence.

[¶16] After the close of evidence, the prosecutor made a closing argument that concluded with remarks that Woodard contends constitute prosecutorial misconduct:

> This is a theft one nickel and three to 3-1/2 cents at a time. We need to *send a message* to those who would fraudulently redeem bottles in large quantities from away, we need to *send a message* that you can't be ripping off Maine beverage distributors who will pass those costs along to Maine consumers. We ask you to find Tom Woodard guilty of theft by deception in the fraudulent redemption of bottles to Maine distributors.

(Emphasis added.) Woodard did not object to this closing argument at trial.

[¶17] Before the court charged the jury, Woodard requested a jury instruction that "if the actor in fact believes in the accuracy of the impression created or reinforced he is not guilty of deception even though his belief was stupid or unreasonable." The court declined to offer this instruction but did provide the following instructions regarding state of mind for this particular crime:

> Deception occurs when a person intentionally, that is has the conscious purpose or object to do so, intentionally creates or reinforces an impression which is false and which that person does not believe to be true or fails to correct an impression which is false and which a person does not believe to be true and which that person previously created or reinforced. . . .

10

. . . .

Now, on the necessary state of mind in which the State must prove that the actions of each Defendant were intentional, on the subject of intent, intent often cannot be proven directly because there is not always direct evidence of a person's state of mind, but you may infer a person's state of mind from surrounding circumstances. In determining whether the State has proven beyond a reasonable doubt that a Defendant acted with intent to deprive of property, you may consider any statement made or any act done or omitted by a Defendant and all other facts in evidence which may indicate a state of mind.

The court also instructed, "[S]tatements or arguments of counsel are not evidence."

[¶18] The jury found Woodard guilty of theft by deception of property worth more than $10,000. *See* 17-A M.R.S. § 354(1)(B)(1). The court sentenced Woodard to twenty-one months in prison, all but twenty-one days suspended, with two years of probation, and ordered him to pay $10,000 in restitution and $25 to the Victims' Compensation Fund, *see* 5 M.R.S. § 3360-I (2011).[5] Woodard timely appealed pursuant to 15 M.R.S. § 2115 (2012) and M.R. App. P. 2.

### III. DISCUSSION

A.    Sufficiency of the Evidence

[¶19] "When a defendant in a criminal case challenges the sufficiency of the evidence to support the finding of guilt, we view the evidence in the light most favorable to the State to determine whether the fact-finder could rationally find

---

[5] This statute was recently amended to provide that the imposition of the assessment may not be waived. *See* P.L. 2011, ch. 628, § 1 (effective Aug. 30, 2012) (codified at 5 M.R.S. § 3360-I (2012)).

every element of the offense beyond a reasonable doubt." *Haag*, 2012 ME 94, ¶ 17, 48 A.3d 207 (quotation marks omitted). "As the fact-finder, the jury is permitted to draw all reasonable inferences from the evidence presented at trial." *Id.* For instance, "intent can be inferred from the evidence." *State v. Schmidt*, 2008 ME 151, ¶ 21, 957 A.2d 80. We will vacate a judgment entered upon a jury verdict "only where no trier of fact rationally could find proof of guilt beyond a reasonable doubt." *Haag*, 2012 ME 94, ¶ 17, 48 A.3d 207 (quotation marks omitted).

[¶20] A person commits the Class B crime of theft by deception if "[t]he person obtains or exercises control over property of another as a result of deception and *with intent* to deprive the other person of the property," 17-A M.R.S. § 354(1)(A) (2012) (emphasis added), and the property is worth more than $10,000, *id.* § 354(1)(B)(1). "A person acts intentionally with respect to a result of the person's conduct when it is the person's conscious object to cause such a result." 17-A M.R.S. § 35(1)(A) (2012).

[¶21] Two definitions of deception could apply based on the evidence presented here. First, deception occurs when a person intentionally "[c]reates or reinforces an impression that is false and that the person does not believe to be true, including false impressions as to identity, law, value, knowledge, opinion, intention or other state of mind." 17-A M.R.S. § 354(2)(A) (2012). Alternatively,

12

deception occurs when a person intentionally "[f]ails to correct an impression that is false and that the person does not believe to be true and that . . . [t]he person had previously created or reinforced." 17-A M.R.S. § 354(2)(B)(1) (2012).

[¶22] Here, the State offered evidence that Woodard exercised control over funds that belonged to Maine beverage distributors by intentionally creating the false impression that the beverage containers that he delivered in exchange for those funds had been sold to consumers in Maine. *See id.* §§ 35(1)(A), 354(1)(A), (2)(A). The State offered circumstantial evidence that, in taking these actions, Woodard did not believe that the containers had originally been sold as full beverage containers to consumers in Maine, with a five-cent deposit collected from the consumer. *See id.* § 354(2)(A). Specifically, Woodard was aware that Reed was from New Hampshire and delivered containers after hours; he was in contact with Reed by telephone soon after Reed's bottle delivery was interrupted by law enforcement; he knew that Prybot was from Massachusetts and that Prybot delivered large numbers of containers for redemption without being questioned about their origins; and he understood from signs and cards that the Department of Agriculture required him to post and hand out at Green Bee that containers not sold in Maine were not eligible for redemption.

[¶23] Although the trial record does not contain direct evidence that each of the thousands of redeemed containers was from a beverage that was purchased by

the consumer outside of Maine, "[a] conviction based on circumstantial evidence is not . . . any less conclusive" of a defendant's guilt. *State v. Deering*, 1998 ME 23, ¶ 13, 706 A.2d 582. "A factfinder may draw all reasonable inferences from the circumstantial evidence, and it is not necessary for the factfinder to eliminate any possible alternative explanation of the evidence . . . ." *Id.* (quotation marks omitted). Instead, "the question is whether such alternative is sufficiently credible in light of the entire record that it necessarily raises a reasonable doubt." *Id.* (quotation marks omitted). Here, the circumstantial evidence was sufficient for a jury to rationally find beyond a reasonable doubt that (1) Woodard knew the containers were not from beverages sold to consumers in Maine and (2) Woodard nonetheless submitted the containers to distributors, creating the impression that they *were* from Maine, in order to obtain eight to eight-and-one-half cents per container. *See* 17-A M.R.S. §§ 35(1)(A), 354(1)(A), (2)(A). He did not at any time correct this false impression. *See* 17-A M.R.S. § 354(2)(B).

[¶24] Finally, the State offered direct and circumstantial evidence to demonstrate that the funds accepted by Woodard from the distributors for the out-of-state containers exceeded $10,000 in value. *See id.* § 354(1)(B)(1). Even using the lower three-cent-per-container charge for handling fees, evidence of checks issued to Reed and Prybot from Green Bee could have persuaded the jury of redemptions generating a total of $10,099.68 in refunds and handling fees. The

circumstantial evidence was, therefore, sufficient for a jury to rationally find beyond a reasonable doubt that Green Bee had redeemed enough out-of-state bottles to have received and taken control of more than $10,000 from distributors. *See id.*

[¶25] There was competent evidence in the record from which a jury could rationally find each element of the charged crime beyond a reasonable doubt. *See id.* §§ 35(1)(A), 354(1)(A), (1)(B)(1), (2)(A); *Haag*, 2012 ME 94, ¶ 17, 48 A.3d 207. Accordingly, we will affirm Woodard's conviction unless some other defect in the proceedings requires us to vacate the judgment.

B. Evidence of Acts Outside the Time Range Stated in the Indictment

[¶26] Woodard argues that, although the indictment charged that he had committed theft "[f]rom on or about April 4, 2008, to on or about February 18, 2010," the State's evidence concerned events that occurred primarily in March 2010.

[¶27] "Proof of the commission of [an] offense on any date within the statute of limitations, regardless of the date alleged in the indictment, is not a material variance from the indictment, unless it prejudices the defendant." *State v. Standring*, 2008 ME 188, ¶ 14, 960 A.2d 1210; *see also State v. St. Pierre*, 1997 ME 107, ¶ 14, 693 A.2d 1137 (explaining that the State need not prove that alleged criminal conduct occurred on a specific date if time is not an element of the crime).

Prejudice is avoided as long as the indictment is "sufficiently specific to enable the preparation of a defense and to protect the defendant against further jeopardy for the same offense." *Standring*, 2008 ME 188, ¶ 14, 960 A.2d 1210. If heightened specificity has not been obtained through a request for a bill of particulars, "a time variance between the allegation in the indictment and the proof at trial is not fatal to a criminal conviction." *Id.*

[¶28] Here, the one-month variance in the approximate end date of the charged conduct did not prejudice Woodard, who had notice that he was charged with theft that was ongoing over a period of about two years. Furthermore, the evidence regarding the March 2010 events was relevant and admissible as circumstantial evidence that Woodard committed the charged crime through an ongoing scheme of accepting out-of-state bottles for redemption. *See* M.R. Evid. 401, 402, 404(b); *State v. Allen*, 2006 ME 20, ¶ 18, 892 A.2d 447 (stating that evidence is admissible notwithstanding Rule 404(b) "to show lack of accident, design, motive, knowledge, plan, scheme, and identity" because such evidence is not offered to show action in conformity with a character trait).

[¶29] That Woodard was not also charged with attempted theft by deception, *see* 17-A M.R.S. §§ 152, 354 (2012), for his role in the March 2010 bottle delivery, which was interrupted by Trahan and local police, does not change this outcome. Evidence of Woodard's conduct at that time served to demonstrate

the nature of his ongoing arrangement with Reed and was therefore probative and admissible regarding the charged crime. *See Allen*, 2006 ME 20, ¶ 18, 892 A.2d 447.[6]

C.     Admission of Photographs of Prybot's Barn

[¶30]   Woodard contends that the photographs of Prybot's barn should not have been admitted because Woodard was unable to cross-examine Prybot fully about whether he or his father was responsible for setting up the sorting station in the Prybot barn.   Woodard contends that these photos were part of the evidence used to indict Prybot's father, who died before he could be tried, and that Woodard and the State agreed before trial that Prybot's father would not be mentioned.

[¶31]   We do not review claims of error that result from a party's choice of trial strategy. *State v. Rega*, 2005 ME 5, ¶ 17, 863 A.2d 917.   Although Woodard complains that he was constrained by the agreement that he and the State struck, which required both parties not to mention Prybot's father, we will not, on appeal, relieve him of the consequences of that agreement.   Furthermore, because the State based its case on evidence of checks that were issued to Prybot—not his father— cross-examination regarding whether Prybot acted alone is largely irrelevant. *See* M.R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to

---

[6] We are unpersuaded by Woodard's additional agreement that the evidence was inadmissible because its probative value was outweighed by the risk of unfair prejudice, and we do not discuss this issue. *See* M.R. Evid. 403.

make the existence of any fact *that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence." (emphasis added)).

D.    Prosecutorial Misconduct

[¶32]    Woodard next argues that the prosecutor's demand of the jury to "send a message to those who would fraudulently redeem bottles in large quantities from away" gave rise to an obvious error or defect because the jury was asked to convict for a reason other than Woodard's guilt.

[¶33]    When the defense does not object to a prosecutor's comments in closing, we will vacate the resulting judgment only if any improper conduct gave rise to obvious error.  *See* M.R. Crim. P. 52(b); *State v. Dolloff*, 2012 ME 130, ¶ 35, 58 A.3d 1032.  "To demonstrate obvious error, the defendant must show that there is (1) an error, (2) that is plain, and (3) that affects substantial rights." *Dolloff*, 2012 ME 130, ¶ 35, 58 A.3d 1032 (quotation marks omitted).  To establish that the error affected a defendant's substantial rights, the defendant has a significant burden of demonstrating "a reasonable probability that [the prosecutor's statement] affected the outcome of the proceeding."  *Id.* ¶¶ 37-38.  "Even if these three conditions are met, we will set aside a jury's verdict only if we conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings."  *Id.* ¶ 35 (quotation marks omitted).

[¶34]   Although we have not previously had occasion to opine on the propriety of a prosecutor asking a jury to "send a message," we have long criticized prosecutors' appeals to public perception or other social issues that go beyond the evidence produced at trial. *See id.* ¶ 40 (stating that a prosecutor's "efforts must be tempered by a level of ethical precision that avoids overreaching and prevents the fact-finder from convicting a person on the basis of something other than evidence presented during trial"); *State v. Martel*, 103 Me. 63, 66, 68 A. 454 (1907) (requiring that a prosecutor's comments be "strictly confined to the domain of facts in evidence").   The jury's function is to decide the case on the evidence before it in accordance with the law as instructed by the trial judge. Accordingly, a "prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence."   ABA Standards for Criminal Justice: Prosecution Function and Defense Function § 3-5.8(d) (1993); *see also United States v. Manning*, 23 F.3d 570, 574 (1st Cir. 1994) (explaining that "it should be beyond question that . . . arguments urging a jury to act in any capacity other than as the impartial arbiter of the facts in the case before it are improper").   Within our constitutional framework, it is not the role of a jury in a criminal case to send messages about matters of public concern, even though that may be the effect of a verdict in some instances.   Jurors should not be invited to

arrive at a verdict for any reason other than their evaluation of the evidence of a defendant's guilt or innocence.

[¶35]  As the *Maine Jury Instruction Manual* more particularly provides, "Arguments to juries urging them to 'send a message' or other similar invitations to consider possible consequences of their verdict outside the parameters of the record of the case are improper."  Alexander, *Maine Jury Instruction Manual*, § 5-7 at 5-15 (4th ed. 2012); *see Dolloff*, 2012 ME 130 ¶¶ 67-73, 58 A.3d 1032 (criticizing the prosecutor's "do justice" argument); *see also Campbell v. State*, 679 So. 2d 720, 724 (Fla. 1996) (criticizing "message to the community" arguments in death penalty sentencing proceedings as "an obvious appeal to the emotions and fears of the jurors" (quotation marks omitted)); *Commonwealth v. DeJesus*, 860 A.2d 102, 113-19 (Pa. 2004) (vacating a sentence because the prosecutor argued to the jury, "there are messages to be sent" on the streets by imposing the death penalty—a plea to an "external irrelevancy" that is prejudicial per se in the context of death penalty sentencing).

[¶36]  In view of these longstanding legal principles, the first two prongs of the obvious error analysis have been met.  The prosecutor's tactic in this case of asking the jury to "send a message" amounted to (1) error that is (2) plain.  Nevertheless, addressing the third prong of the obvious error analysis, we conclude that Woodard has failed to meet his significant burden of demonstrating a

reasonable probability that the error was sufficiently prejudicial to have affected the outcome of the proceeding, thereby affecting his substantial rights. *Dolloff*, 2012 ME 130, ¶¶ 37-38, 58 A.3d 1032. The State presented a strong case against Woodard, and the prosecutor's appeal to the jury to "send a message" was mentioned only briefly and was not a focus of the prosecutor's closing arguments. Furthermore, the court instructed the jurors in Woodard's trial that they were not to consider the attorneys' arguments as evidence.

[¶37] Viewing the error in relation to the trial as a whole, the error was not "sufficiently prejudicial to have affected the outcome of the proceeding." *Id.* ¶ 37 (quotation marks omitted); *see United States v. Stover*, 2012 U.S. Dist. LEXIS 24777, at *27-30 (S.D.W.V. 2012) (holding that an unpreserved claim of error arising from a prosecutor's statement, in an otherwise relatively strong case, that the jury should "send a message" did not affect the defendant's substantial rights); *People v. Gallegos*, 260 P.3d 15, 27-28 (Colo. App. 2010) (holding that, although it is improper for a prosecutor to ask a jury to find a defendant guilty to "send a message to the community," the statement was not so egregious in the context of the trial as to require that the conviction be vacated); *People v. Desantiago*, 850 N.E.2d 866, 873-75 (Ill. App. Ct. 2006) (affirming a conviction on plain error review despite the prosecutor's argument encouraging the jury to "send a

message," in part because the court instructed the jury that the closing arguments were not evidence).

[¶38]   Because we conclude that Woodard failed to demonstrate that the prosecutorial misconduct affected his substantial rights, we do not address the fourth prong of the obvious error analysis: whether the error seriously affected the fairness and integrity or public reputation of judicial proceedings. *See Dolloff*, 2012 ME 130, ¶ 35, 58 A.3d 1032.

E.      Jury Instructions

[¶39]   Woodard argues that the court erred in denying his request to instruct the jury that, to find him guilty, it had to find he had been knowingly deceitful— not ignorant or negligently unaware—when processing the out-of-state containers.

[¶40]   "We review the denial of a requested jury instruction for prejudicial error, and will vacate a judgment on this basis only when the denied instruction (1) stated the law correctly; (2) was generated by the evidence in the case; (3) was not misleading or confusing; and (4) was not sufficiently covered in the instructions the court gave." *State v. Ouellette*, 2012 ME 11, ¶ 7, 37 A.3d 921 (quotation marks omitted).

[¶41]   Regarding the mens rea for theft by deception, the court stated clearly:

Deception occurs when a person intentionally, that is has the conscious purpose or object to do so, intentionally creates or reinforces an impression which is false and which that person does not

believe to be true or fails to correct an impression which is false and which a person does not believe to be true and which that person previously created or reinforced.

These instructions sufficiently explained the state of mind that a person must possess to be convicted of theft by deception. *See* 17-A M.R.S. §§ 35(1)(A), 354(1)(A), (2)(A), (2)(B)(1). The instructions were adequate to inform the jury that it could not convict Woodard upon a finding that Woodard processed the out-of-state containers through mere negligence or ignorance.

The entry is:

Judgment affirmed.

---

**On the briefs:**

Richard D. Grundy, Esq., Lynnfield, Massachusetts, and Neil Jamieson, Esq., Prescott, Jamieson, Nelson & Murphy, Portland, for appellant Thomas Woodard

William J. Schneider, Attorney General, and Leanne Robbin, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Richard D. Grundy, Esq., for appellant Thomas Woodard

Leanne Robbin, Asst. Atty. Gen., for appellee State of Maine