MAINE SUPREME JUDICIAL COURT                              Reporter of Decisions
Decision:     2020 ME 17
Docket:       Wal-18-440
Argued:       September 25, 2019
Decided:      January 30, 2020
Revised:      June 18, 2020

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN,* and HUMPHREY, JJ.**

STATE OF MAINE

v.

BRADLEY WILLIAMS

PER CURIAM

[¶1]  Bradley Williams appeals from a judgment of conviction of two counts of stalking (Class D), 17-A M.R.S. § 210-A(1)(A)(1) (2018), and two counts of harassment (Class E), 17-A M.R.S. § 506-A(1)(A) (2018), entered by the trial court (Waldo County, *Billings, J.*) after a jury trial.  He challenges the fairness of the trial and argues[1] that the court made two erroneous evidentiary

---

  * Although not available at oral argument, Justice Gorman participated in the development of this opinion.  *See* M.R. App. P. 12(a)(2) ("A qualified Justice may participate in a decision even though not present at oral argument.").

  ** Although Justice Hjelm participated in the appeal, he retired before this opinion was certified.

  [1]  Williams also argues that his standby counsel was constitutionally ineffective in failing to request a Title 15 examination to determine competency and in failing to make objections at trial. We decline to depart from the bright-line rule we have consistently applied for over two decades that we will not consider ineffective assistance of counsel claims on direct appeal.  *See Petgrave v. State*, 2019 ME 72, ¶ 10, 208 A.3d 371; *see also* 15 M.R.S. §§ 2121-2132 (2018).

rulings and erred in denying his first motion for a judgment of acquittal, in amending the complaint sua sponte to conform to the evidence after his second motion for a judgment of acquittal, and in failing to give certain jury instructions. We affirm the judgment.

## I. BACKGROUND

[¶2] When the evidence is viewed in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt. *See State v. Woodard*, 2013 ME 36, ¶ 19, 68 A.3d 1250. Williams first met the victims—a married couple—shortly after they moved to Lincolnville in 2006, when he appeared at their home unsolicited and offered to clean their chimneys. The victims initially hired him, but his presence in their home made them uncomfortable, so they requested that he not return to complete the work. Williams showed up at the victims' home uninvited at least one other time and was told to leave. Other than periodic, incidental interactions, the victims had no further significant contact with Williams until August 2014, when he appeared uninvited at a private sale at the victims' store. The victims repeatedly asked him to leave them alone.

[¶3] In August or early September 2014, Williams sent a letter to the victims' home describing a "series of three visions" about one of the victims,

including one in which he "witnessed [her] death" and another in which he "saw [her] after [her] death."  The victims and others who read the letter found it disturbing and threatening.  The victims sought and obtained cease harassment notices against Williams, and Williams was served with those notices on September 3, 2014.

[¶4]  On September 4, 2014, Williams sent another letter to the victims, this time articulating his belief that the cease harassment notices were "fraudulent."  The following day, Williams sent a third letter to the victims, in which he acknowledged that the victims wished to be left alone but nevertheless accused them of filing a false report against him.

[¶5]  After receiving the third letter, the victims did not hear from Williams again until January 2016.  Around this time, Williams sent an angry and threatening letter to the victims' attorney.  Williams also began posting fliers around Belfast accusing one of the victims of being a dangerous unprosecuted criminal.  The victims sought and obtained two new cease harassment notices, which were issued on January 9, 2016.  On June 3, 2016, the victims received another letter from Williams that made various threats and demands.  They brought this letter to the attention of law enforcement.

Williams's behavior led the victims to take extensive safety precautions and caused one of the victims to seek treatment for anxiety.

[¶6]  In August 2016, Williams was charged by criminal complaint with two counts of stalking (Class D), 17-A M.R.S. § 210-A(1)(A)(1), and two counts of harassment (Class E), 17-A M.R.S. § 506-A(1)(A).  At his arraignment, Williams entered a plea of not guilty on all four counts.  Williams requested and was appointed counsel, but he filed a request to proceed pro se shortly before the original trial date.

[¶7]  Prior to trial, the court met with Williams, his attorney, and the attorney for the State to discuss Williams's reasons for wanting to represent himself.  Williams felt that his trial counsel was not sufficiently knowledgeable about the underlying facts of the case and the history between him and the victims.  The court then conducted an extensive and careful colloquy with Williams, during which the court warned him of the many risks of representing himself at trial.  The court periodically confirmed with Williams that he understood these risks, and he repeatedly stated that he did.  At the end of this exchange, Williams said that he still wished to represent himself at trial, but he agreed to have his appointed attorney serve as standby counsel.  Later, prior to jury selection, Williams also agreed that, during the trial, standby counsel

would be permitted to make objections on his behalf and to conduct the direct examination of him.

[¶8] At trial, after the close of the State's evidence, Williams moved for a judgment of acquittal, M.R.U. Crim. P. 29, on one of the harassment counts on the ground that the State was required to prove two acts of harassment against the victims but had established only one—the June 3, 2016, letter. The court denied this motion, concluding that the jury could make a reasonable inference that the fliers Williams posted in January 2016 were intended to harass both victims and that posting the fliers could be found to constitute a second act of harassment.

[¶9] Williams then made a second motion for a judgment of acquittal on both harassment counts on the ground that the complaint alleged he had engaged in a course of conduct constituting harassment "beginning on or about January 9, 2016, and ending on or about June 6, 2016, in Lincolnville, Waldo County, Maine," but the evidence at trial showed that some of the acts forming the basis of the harassment charges occurred in Belfast, a different municipality in Waldo County. The State opposed the motion, arguing that a course of conduct can take place in multiple locations, and the complaint merely specifies the location where the course of conduct ended and does not list each

municipality or jurisdiction where any part of the course of conduct occurred. The following exchange took place:

> THE COURT: What about—Mr. Woodbury, what about the other issue that Mr. McLean is arguing, that is sort of by the nature of harassment charges that the course of conduct can be a broader—
>
> MR. WOODBURY: It can. He should have said in Waldo County.
>
> MR. MCLEAN: It does say Waldo, it says Lincolnville, Waldo County. But again, it could cross jurisdictional lines.
>
> MR. WOODBURY: Well, Belfast and Lincolnville, I mean he should have been more specific I think. I hate to argue a technical point, but it's—it's there.

Although no formal motion, written or oral, was presented to the court, the court, over Williams's objection and based on the parties' arguments, permitted the amendment of Counts 2 and 4 of the complaint to allege "in Waldo County," and denied the second motion for a judgment of acquittal. M.R.U. Crim. P. 3(d); M.R.U. Crim. P. 29. The court stated that it did not perceive any prejudice to Williams because the discovery put him on notice that some of the acts alleged to form part of the course of conduct constituting harassment occurred in Belfast.

[¶10] The jury returned verdicts of guilty on all four counts. On the first stalking charge, the court sentenced Williams to 364 days in jail, all but ninety days suspended, and a one-year term of probation. The court imposed

concurrent jail sentences of ninety days on the second stalking charge and forty-eight hours on each harassment charge.[2]  Finally, the court imposed an additional concurrent sentence of thirty days for contempt based on Williams's conduct during the trial.  Williams timely appealed, and the court stayed execution of the sentences pending appeal.

## II.  DISCUSSION

A.    The Court's Conduct During the Trial

[¶11]  Williams argues that the trial court created a "prejudicial trial environment" and thereby violated his right to a fair trial.[3]  The record, however, tells a different story.

[¶12]  Williams chose to proceed without counsel and was a difficult and at times combative litigant who repeatedly disregarded the court's rulings and instructions, badgered witnesses, and asked inappropriate questions during his examination of them.  Despite this, the court was patient with Williams and often paused to explain the legal basis of its rulings to him.  During a chambers

---

[2] Williams was also ordered to pay $20 to the Victims' Compensation Fund on each count, totaling $80.

[3] Williams relies in large part on a statement by the court, made outside the presence of the jury, in which the court said, "I think it would be fair to say that I probably—I've certainly showed my frustrations with you and at times I may have shown anger with you in front of the jury and that is not something I intended to do or liked to do."

8

conference at the conclusion of the trial, Williams told the court that he felt it had been "amazingly fair." The court also instructed the jury that although it had occasionally been required to insert itself into the proceedings, the jury alone was required to decide the facts based on the evidence presented. We conclude that Williams received a fair trial. *See Lisenba v. California*, 314 U.S. 219, 236 (1941) ("[D]enial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.").

B.    Evidentiary Rulings

[¶13]  Williams raises two issues related to evidentiary rulings by the trial court. We address each in turn.

1.    The Previous Protection from Harassment Hearing

[¶14]  We reject Williams's argument that the judgment entered in his favor in the prior protection from harassment (PFH) matter was entitled to res judicata effect in this criminal prosecution.

[¶15] Williams argues that the court erred when it denied him the ability to present evidence related to the previous PFH matter involving him and one

of the victims because that hearing resulted in a judgment in Williams's favor and was entitled to res judicata effect.

[¶16] Collateral estoppel, the prong of res judicata that prevents the re-litigation of factual issues previously decided, applies when "(1) the identical factual issue was decided by a prior final judgment, and (2) the party to be estopped had an opportunity and an incentive to litigate the issue at the prior proceeding." *State v. Hughes*, 2004 ME 141, ¶ 5, 863 A.2d 266. "A party has a *fair opportunity* to litigate an issue if that party either controls the litigation, substantially participates in that litigation, or could have participated in the litigation had they chosen to do so." *Id.* ¶ 5 (emphasis in original). "The party who asserts collateral estoppel bears the burden of establishing that the party to be estopped had a fair opportunity to litigate the issue in the prior proceeding." *Id.* ¶ 6.

[¶17] The record does not clearly establish that the issues litigated at the prior PFH hearing were the same as the issues litigated at the trial here, and the State had neither a fair opportunity nor an incentive to litigate any issues at the PFH hearing. At trial, to support the criminal harassment charges, the State presented evidence that Williams had sent a threatening letter to the victims on June 3, 2016, in violation of an active cease harassment order issued in

January 2016. His act of sending that letter had not yet occurred on April 25, 2016, when the PFH hearing took place. Although both the PFH hearing and the criminal trial focused on whether Williams had engaged in harassment of the victims, the PFH hearing did not address the issue of whether, considering the June 3, 2016, letter, there was sufficient evidence to conclude beyond a reasonable doubt that Williams violated 17-A M.R.S. § 506-A. What is truly fatal to Williams's res judicata argument, however, is that the State was not a party to the PFH hearing, and Williams has not established that the State "control[led] the litigation, substantially participate[d] in that litigation, or could have participated in the litigation had [it] chosen to do so." *See Hughes*, 2004 ME 141, ¶¶ 2, 5-6, 863 A.2d 266 (rejecting claim of collateral estoppel where defendant was convicted of assault against a victim who had previously sought and was denied a protection from harassment order based on the same incident). Even if the issues presented in the two proceedings were identical, the fact that the State did not have a "fair opportunity to litigate [any issues] in the prior proceeding," *id.* ¶ 6, nullifies Williams's claim that the judgment in his favor following the PFH hearing was entitled to res judicata effect.

2.      Victim's Testimony Regarding Prior Civil Lawsuit

[¶18]  We are also not persuaded by Williams's argument that the court erred when it allowed one of the victims to testify that a lawsuit Williams filed against the victim was dismissed with prejudice.  Williams himself elicited this testimony by asking the victim about the lawsuit on cross-examination and neither Williams nor his standby counsel objected to the answers he now challenges on appeal.  *See State v. Pabon*, 2011 ME 100, ¶ 29, 28 A.3d 1147 (articulating the obvious error standard of review for unpreserved claims).

C.      Motions for Judgment of Acquittal

1.      The First Motion for a Judgment of Acquittal

[¶19]  Williams argues that the court erred in denying his first motion for a judgment of acquittal, M.R.U. Crim. P. 29, and that the court applied an incorrect standard in ruling on that motion.  On appeal, "[w]e review the denial of a motion for judgment of acquittal by viewing the evidence in the light most favorable to the State to determine whether a jury could rationally have found each element of the crime proven beyond a reasonable doubt."  *State v. Adams*, 2015 ME 30, ¶ 19, 113 A.3d 583 (quotation marks omitted).  The jury may draw all reasonable inferences from the evidence presented at trial.  *Woodard*, 2013 ME 36, ¶ 19, 68 A.3d 1250.

[¶20]   When the evidence is viewed in the light most favorable to the State, and given the content of the fliers, the jury rationally could have found that Williams intended to harass both victims when he posted the fliers around Belfast and when he sent the June 3, 2016, letter.   The fliers included the victims' home address, accused one of the victims of being an unprosecuted criminal, referenced the victims' children, and encouraged people to call the police regarding one of the victims.   The June 3 letter, which threatened one of the victims and made accusations about that victim based on the victim's marriage to the other victim, could support an inference that the fliers were similarly intended to harass both victims.   And, contrary to Williams's contention, the trial court did not apply an incorrect standard in ruling on the motion for judgment of acquittal.  *See Woodard*, 2013 ME 36, ¶ 19, 68 A.3d 1250.  The court correctly concluded that the jury could rationally have found each element of the crime of harassment beyond a reasonable doubt.

2.      The Second Motion for a Judgment of Acquittal

[¶21]   Williams contends that the court erred in permitting the amendment of Counts 2 and 4 of the complaint to allege "in Waldo County" rather than "in Lincolnville, Waldo County, Maine," after his second motion for a judgment of acquittal.   We review the court's decision to permit the

amendment of the complaint for an abuse of discretion. *See State v. Johnson*, 585 A.2d 825, 826 (Me. 1991).

[¶22] Rule 3(d) of the Maine Rules of Unified Criminal Procedure provides that "[t]he court may permit a complaint to be amended at any time before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced." Neither Williams nor the State formally moved to amend the complaint;[4] however, in arguing their positions on the motion, the defense agreed with the State that a course of conduct can occur in more than one place and even across jurisdictions, and stated, on the record, "He should have said in Waldo County." Therefore, although no formal motion to amend the complaint was made, both sides had the opportunity to argue their positions regarding the amendment, and agreed that the relevant course of conduct occurred in Waldo County.

[¶23] As already discussed, the amendment itself merely changed the location alleged in the complaint from "Lincolnville, Waldo County" to "Waldo County." The amendment did not charge any additional or different crimes. Location is not an element of the crime of harassment, and the State was not

---

[4] The court did acknowledge, when the motion was made, that "obviously if necessary the state could move to amend the complaint to include Lincolnville and/or Belfast."

required to prove that the course of conduct constituting harassment occurred in a particular location. *Cf. State v. Siviski*, 663 A.2d 568, 570 (Me. 1995). The court did not err in concluding that the amendment would not prejudice Williams because he was on notice of the facts alleged in the amended complaint through discovery. *Cf. State v. Johnson*, 2005 ME 46, ¶¶ 15-16, 870 A.2d 561. Therefore, the trial court did not abuse its discretion in permitting the complaint to be amended to conform to the evidence presented at trial.

D.      Jury Instructions

[¶24]  Williams also contends that the trial court erred in failing to give three jury instructions.[5]  Because Williams did not object to the court's failure to give these jury instructions at trial, or to the instructions that were given, these claims of error are unpreserved on appeal, and we review the jury instructions for obvious error.[6]  *State v. Lajoie*, 2017 ME 8, ¶ 13, 154 A.3d 132.

---

[5]  Williams argues that the court erroneously failed to instruct the jury that (1) "the 'absence of reasonable cause' [is] part of the State's burden of proof" with respect to the harassment counts; (2) "certain speech, such as political speech, is protected by the First Amendment of the United States Constitution and by Article I, §§ 4 and 6-A of the Maine Constitution," and "a public figure may be subject to certain conduct through writings and speech that an ordinary person may not be subject to, and also that in these situations, that 'actual malice' had to be proved"; and (3) "anti-SLAPP [is] an affirmative defense."

[6]  "To demonstrate obvious error, the defendant must show that there is (1) an error, (2) that is plain, and (3) that affects substantial rights. Even if these three conditions are met, we will set aside a jury's verdict only if we conclude that (4) the error seriously affects the fairness and integrity or

Jury instructions must inform the jury correctly and fairly in all necessary respects of the governing law. *State v. Tucker*, 2015 ME 68, ¶ 11, 117 A.3d 595. Contrary to Williams's argument, we conclude that the trial court committed no obvious error in its instructions to the jury.[7]

E.     Ethical Considerations

[¶25]   Although Williams is represented by counsel in this appeal, he argues, purportedly in a self-represented capacity, that the bail commissioner's fee, paid directly to the bail commissioner, not to the court, and explicitly provided for in 15 M.R.S. § 1023(5) (2018), constitutes extortion in violation of his constitutional due process rights. The argument relies on specious claims to attack the integrity of Maine's state courts. The argument is without merit, and we address it no further.

---

public reputation of judicial proceedings." *State v. Pelletier*, 2019 ME 92, ¶ 9, 210 A.3d 177 (quotation marks omitted).

[7] The record reveals that the trial court clearly instructed the jury regarding all statutorily required elements of the crimes of stalking (Class D), 17-A M.R.S. § 210-A(1)(A)(1) (2018), and harassment (Class E), 17-A M.R.S. § 506-A(1)(A) (2018). The trial court committed no obvious error in not instructing the jury regarding the First Amendment right to freedom of speech because the conduct proscribed by Maine's criminal harassment and stalking statutes is not protected by the First Amendment of the United States Constitution or article I, section 4 of the Maine Constitution. *See Childs v. Ballou*, 2016 ME 142, ¶¶ 17, 24-27, 148 A.3d 291; *State v. Cropley*, 544 A.2d 302, 304-05 (Me. 1988). Finally, the trial court committed no obvious error in not giving a jury instruction regarding Maine's anti-SLAPP (strategic litigation against public participation) law, 14 M.R.S. § 556 (2018), because, by its plain terms, Maine's anti-SLAPP statute applies only in civil, not criminal, cases.

[¶26]   However, we are concerned that the claim was included in counsel's brief.   Although counsel attempted to distance himself from the allegation, he alone signed the brief that incorporated his client's argument.  An unfounded claim such as this appearing in a brief submitted by an attorney, if attributable to that attorney, could constitute a violation of Rule 8.2(a) of the Maine Rules of Professional Conduct, which prohibits an attorney from making any statement "the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the integrity of a judge."

[¶27]   We take this opportunity to remind Maine's attorneys of their ethical obligations as members of the legal profession.  Attorneys, unlike their clients, are subject to the Maine Rules of Professional Conduct.  *See* M.R. Prof. Conduct 8.4 cmt. 1 ("Lawyers are subject to discipline when they violate or attempt to violate the Rules of Professional Conduct . . . .").  Attorneys are bound by the contents of the briefs they sign.  *See* M.R. Prof. Conduct 3.3 cmt. 3 ("An advocate is responsible for pleadings and other documents prepared for litigation . . . .").  Therefore, when a client who is represented by counsel insists on presenting any argument or assertion that is not endorsed by the attorney— particularly one that, if made by the attorney, might violate the Maine Rules of Professional Conduct, *see* M.R. Prof. Conduct 1.2 cmt. 13—such argument or

assertion *should not* be incorporated into the brief drafted and submitted by the attorney.  Rather, it is incumbent upon the attorney to advise the client to obtain leave of the Court to independently present the argument or assertion in a separate brief or writing signed by the client only.

The entry is:

Judgment affirmed.

---

Ezra A. R. Willey, Esq. (orally), Willey Law Offices, Bangor, for appellant Bradley Williams

Natasha Irving, District Attorney, and Elizabeth Noble, Asst. Dist. Atty. (orally), Prosecutorial District VI, Belfast, for appellee State of Maine

Waldo County Unified Criminal Docket docket number CR-2016-711
FOR CLERK REFERENCE ONLY