2006 ME 20

**STATE of Maine**

v.

**Sarah ALLEN.**

Supreme Judicial Court of Maine.

Argued: Nov. 14, 2005.

Decided: March 2, 2006.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Atty. Gen. (orally), Lisa P. Marchese, Asst. Atty. Gen., Augusta, for State.

Verne E. Paradie Jr. (orally), Trafton & Matzen, Auburn, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

SILVER, J.

[¶ 1] Sarah Allen appeals from a judgment of conviction for manslaughter, 17–A M.R.S. § 203(1)(A) (2005), after a jury verdict entered in the Superior Court (Androscoggin County, *Gorman, J.*). Allen contends that the court erred in prohibiting an expert defense witness from testifying about recent test results as a discovery sanction, and in allowing the State to introduce evidence of a spanking that Allen's husband inflicted on their son the night before the son suffered injuries that ultimately led to his death.[1] Allen also argues

---

1. We affirmed Jeremy Allen's conviction for assault for inflicting this spanking. *State v.* *Allen*, 2006 ME 21, 892 A.2d 456.

that the evidence was insufficient to convict. We disagree and affirm the judgment.[2]

## I. FACTUAL AND PROCEDURAL HISTORY

[¶ 2] Viewed in a light most favorable to the State, the jury could have found the following facts. Sarah Allen was alone with her twenty-one month old son Nathaniel on February 14, 2003, while her husband was at a trade show. At approximately 10 P.M., Allen called 911, frantically telling the dispatcher that Nathaniel had fallen, broken his neck, was not breathing, and was unconscious. During discussions with emergency technicians and doctors that night, Allen maintained that Nathaniel had fallen in the bathtub and on his carpeted bedroom floor multiple times, hitting his head after each fall.

[¶ 3] At approximately midnight, Nathaniel was transported from Mid–Coast Memorial Hospital to Maine Medical Center, where a neurosurgeon subsequently examined Nathaniel's CT scans. The neurosurgeon believed that Nathaniel had suffered a significant head injury and the only hope for his survival was to relieve the pressure on his brain by evacuating the blood that had collected in his head. Following the procedure, and after noting the condition of the blood that came out of Nathaniel's head, the neurosurgeon opined that Nathaniel had suffered a "very, very recent injury, in other words, something that was unlikely to be days, weeks, or months of age."

[¶ 4] The pediatric intensive care specialist who first saw Nathaniel at approximately 2 A.M. concluded, after reading Nathaniel's CT scans, that Nathaniel had injuries consistent with child abuse. The doctor therefore consulted with a child abuse expert who, after examining the CT scans, also concluded that Nathaniel's head injuries were consistent with an inflicted, nonaccidental trauma. The expert concluded that a violent shaking caused Nathaniel's head injuries.

[¶ 5] Nathaniel was declared dead at approximately 6 P.M. on February 15. The radiologist at Maine Medical Center who later examined Nathaniel's CT scans opined that Nathaniel's injuries were consistent with an event having taken place hours prior to the taking of the scans, which were taken after Nathaniel arrived at Maine Medical Center. Additionally, the radiologist did not believe that Nathaniel's injuries could have resulted from a fall because the head injuries he presented with did not have a focal point reflecting an area of impact. He did, however, believe that "the pattern of injury is actually quite characteristic of a shaken baby or of an acceleration/deceleration type of injury." The medical examiner who conducted the autopsy of Nathaniel's body confirmed the radiologist's findings.

[¶ 6] Allen was subsequently charged with manslaughter for causing the injuries leading to Nathaniel's death. Her first trial ended in a mistrial. Prior to Allen's first trial, the court entered an order on motions in limine filed by both sides. The court decided that the State could introduce evidence that Allen and her husband had previously spanked Nathaniel and that Jeremy Allen, while in Allen's presence on February 13, spanked Nathaniel hard enough to leave bruises.

[¶ 7] Allen's retrial was originally scheduled to begin on October 19, 2004. Prior to the retrial, the court revisited its ruling

---

**2.** We have considered the other issues Allen raises on appeal and conclude that they do not merit discussion.

on the admissibility of the spanking evidence. Although the court reaffirmed its earlier ruling, it restricted the scope of the evidence. Specifically, the court ordered that there be no reference to the method by which Jeremy Allen inflicted the spanking or the extent to which Nathaniel presented with bruises from the spanking.

[¶ 8] Allen also filed a motion to continue on October 8. Allen argued that her expert witness, a neuropathologist, needed additional time to run further tests on Nathaniel's brain samples. The court granted Allen's motion, setting November 12 as the deadline for a supplemental report from her expert.[3] On November 17, the court extended the deadline to November 29, in response to Allen's untimely motion for an extension. The November 29 deadline also passed without a submission containing her expert's findings.

[¶ 9] Allen's second trial began on February 15, 2005. On the seventh day of trial, the day before the neuropathologist was scheduled to testify, defense counsel informed the court that the doctor sent him an e-mail the night before, in which she said that her subsequent testing revealed an abnormality in Nathaniel's brain, which was likely evidence of a seizure disorder. The court decided that the doctor would not be allowed to testify to these results, although she could still testify to the facts and opinions contained in her original report, because of the timing of the disclosure.

[¶ 10] Following her second trial, Allen was convicted of manslaughter. She was sentenced to eight years, with all but forty-two months suspended, and placed on three years probation. This appeal followed.

## II. DISCUSSION

### A. Limitation on Defense Expert's Testimony

[¶ 11] Allen argues that the court erred in limiting the neuropathologist's testimony regarding her findings that Nathaniel had a seizure disorder because this evidence was exculpatory. Allen recognizes that exclusion is a permissible sanction for violation of a discovery order, *see* M.R.Crim. P. 16A(d), but she contends that the court should have imposed a less severe sanction, like granting the State additional time, or a continuance, to consider the new evidence.

[¶ 12] We have recognized that the trial court has the discretion to determine what, if any, sanction is appropriate for a discovery violation. *State v. Landry*, 459 A.2d 175, 177 (Me.1983). "The trial court has the authority not only to select a sanction but also to decide whether any sanction is required." *Id.* When the trial court does exercise its discretion and sanction a defendant for noncompliance with a Rule 16A(c) discovery order, we review that decision for an abuse of discretion. *Cf. State v. Gallant*, 595 A.2d 413, 415 (Me.1991) (stating that the court possesses the discretion to sanction a defendant for noncompliance with a court-ordered examination "in the same manner that it may sanction a defendant for failure to comply with a [R]ule 16A discovery order") (citing *State v. Brewer*, 505 A.2d 774, 777 n. 3 (Me.1985))

[¶ 13] Pursuant to M.R.Crim. P. 16A(c)(1), the trial court may order a criminal defendant to supply the State with a

---

**3.** Prior to Allen's first trial, she submitted a report from the neuropathologist, pursuant to M.R.Crim. P. 16A, in which the doctor stated that "[o]ne concern is that the patient may have an undetected seizure disorder that led to his 'bazaar' [*sic*] behavior and loss of consciousness just prior to death."

report containing, among other things, the subject matter of an expert's expected testimony. Should the defendant fail to comply with this order, or Rule 16A in general, the court "may take appropriate action," including sanctioning the defendant or taking no action. M.R.Crim. P. 16A(d). Among the permissible sanctions for a discovery violation, the court may prohibit the defendant from introducing the previously undisclosed evidence. *Id.* The court's discretion, pursuant to Rule 16A(d), is not unfettered, especially if the evidence is exculpatory, *State v. Begin*, 652 A.2d 102, 104 (Me.1995), but a criminal defendant does not possess "the right to present testimony free from the legitimate demands of the adversarial system," *Taylor v. Illinois*, 484 U.S. 400, 413, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988).

■ [¶ 14] The court's decision to exclude portions of the neuropathologist's testimony was well within its discretion. On the seventh day of trial, after the State had already rested and the day before the doctor was scheduled to testify, Allen brought to the court's attention that the doctor had found an abnormality during the course of subsequent tests of Nathaniel's brain samples that she believed was evidence of a seizure disorder. Offering this testimony on the seventh day of trial unfairly surprised the State because the doctor's proposed testimony went beyond what was presented in the report submitted prior to Allen's first trial, in which the doctor hypothesized that "an *undetected* seizure disorder" led to Nathaniel's death. The timing of the disclosure placed the State in a position where it had insufficient time to prepare a cross-examination of the doctor concerning her recent findings, the new methods she used in arriving at them,

or to find and prepare witnesses to rebut this late evidence. *See State v. Thurlow*, 414 A.2d 1241, 1244 (Me.1980) (underlying purpose of the discovery rules is to "enhance the quality of the pretrial preparation of both the prosecution and defense and diminish[ ] the element of unfair surprise at trial, all to the end of making the result of criminal trials depend on the merits of the case"). Given the circumstances under which Allen sought to introduce the neuropathologist's testimony, the trial court did not exceed its discretion in deciding that exclusion was an appropriate sanction. *See DeJesus v. State*, 655 A.2d 1180, 1206–07 (Del.1995) (upholding limitation on scope of criminal defendant's expert witness testimony where it was offered on the final day of trial and went beyond the expert's discovery notice).

[¶ 15] Allen argues that pursuant to *Begin*, it was error for the court to restrict the neuropathologist's testimony, despite the Rule 16A violation, because her testimony would have been exculpatory and *Begin* only authorizes exclusion of exculpatory evidence for willful violations of the discovery rules.[4] *See* 652 A.2d at 104. Allen, however, misconceives our opinion in *Begin*. In *Begin*, the trial court ruled that the defense could not call an exculpatory witness because that witness did not appear on the defense's witness list and jurors' knowledge of the witness, who was involved in a high profile local case, presented the risk of a mistrial. *Id.* We began by noting the defendants' constitutional right to present exculpatory evidence. *Id.* We ultimately found that the court's exclusion of the witness's testimony was error, albeit a harmless one, because the court did not voir dire the jury to determine whether the perceived risk of a

---

4. The court found that defense counsel was not at fault for the discovery violation, a find-

ing that the State does not challenge.

mistrial was real. *Id.* at 105. We recognized, however, that exclusion might have been appropriate had the court weighed the defendants' right to present the exculpatory evidence against the actual prejudice to the State. *Id.* Because the court noted that the timing of Allen's disclosure operated to actually unfairly surprise the State, *Begin* does not foreclose exclusion of this evidence.

## B. Spanking Evidence

[¶ 16] Allen next argues that the trial court erred in allowing the State to introduce evidence that Nathaniel had bruising on his body that resulted from a spanking that Jeremy Allen inflicted on February 13. Allen also argues that the court erred in denying her motion for a mistrial when two prosecution witnesses went beyond the scope of the court's limitations imposed on this evidence.

### 1. Bruises Inflicted by Jeremy Allen

[¶ 17] We review a trial court's evidentiary rulings on relevance and prejudicial effect for clear error and abuse of discretion, respectively. *State v. Moon,* 2000 ME 142, ¶ 7, 755 A.2d 527, 529 (citing *State v. Shuman,* 622 A.2d 716, 718 (Me. 1993)). "We accord wide discretion to the court's determination on the relevancy of the profferred evidence, as well as to its evaluation of any unfair prejudice that may result from the admission of the evidence." *Id.* (citations omitted). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R. Evid. 401.

[¶ 18] "All facts which tend to prove or disprove the matter at issue or which constitute a link in the chain of circumstantial evidence with respect to the act charged are relevant and should be admissible into evidence within judicial discretion unless excluded by some rule or principle of law." *State v. Brown,* 321 A.2d 478, 482 (Me.1974). An exception to the general rule that relevant evidence is admissible is the rule that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." M.R. Evid. 404(b). Evidence of such acts is, however, "admissible when offered to prove something other than that the defendant was acting in conformity with a character trait elucidated by such and when not deemed more prejudicial than probative by the trial [court]." *State v. Ardolino,* 1997 ME 141, ¶ 9, 697 A.2d 73, 77 (citation omitted). Examples of permissible uses of such evidence includes using it to show lack of accident, design, motive, knowledge, plan, scheme, and identity, although "[t]his list is not exhaustive, nor is it conclusive." Field & Murray, *Maine Evidence* § 404.4 at 130 n. 195 (2000 ed. 1999).

[¶ 19] Contrary to Allen's contention, the evidence that Jeremy Allen spanked Nathaniel and inflicted bruises is relevant and probative to negate pretrial statements made by Allen that Nathaniel's injuries may have been the result of falls Nathaniel suffered in the bathtub and later in his bedroom. *See State v. Lockhart,* 2003 ME 108, ¶ 37, 830 A.2d 433, 446 (holding that evidence of prior acts of domestic violence relevant to prove absence of mistake or accident). Moreover, this evidence was also relevant to show that Allen did not object to the spanking and that she was complicit in physically disciplining Nathaniel. Accordingly, this evidence is also relevant and probative of the relationship between Allen and Nathaniel, as well as to show Allen's motive, and that Nathaniel's death may not have been caused by a

genetic defect. *See Ardolino*, 1997 ME 141, ¶ 14, 697 A.2d at 78–79 (upholding admission of evidence that defendant manipulated children to make false accusations of sexual abuse against mother and grandfather as evidence of defendant's state of mind and motive); *State v. Lewisohn*, 379 A.2d 1192, 1201 (Me.1977) (stating that the prior relationship between the defendant and victim was relevant to show motive and lack of accident or mistake).

[¶ 20] Allen further argues that even if the spanking evidence is relevant, it is unfairly prejudicial and should have been excluded pursuant to M.R. Evid. 403.[5] *Ardolino*, 1997 ME 141, ¶ 10, 697 A.2d at 78 (prejudice under Rule 403 means that the jury would decide the case on an "improper basis") (citation omitted). As the State admits, this evidence is somewhat prejudicial to Allen. To mitigate that prejudice, however, the court limited references to the spanking and the extent of the bruising found on Nathaniel. Additionally, the court issued a limiting instruction to inform the jury that Allen did not cause the bruising. *See State v. Thomes*, 1997 ME 146, ¶ 12, 697 A.2d 1262, 1265–66 (noting that limiting instruction issued to jury helped to alleviate prejudice). Given the relevance and probative value of the evidence, the court acted within its discretion in finding that the evidence was not unfairly prejudicial and that any danger of unfair prejudice did not substantially outweigh the probative value of the evidence.

2. Allen's Motions for a Mistrial

[¶ 21] Allen argues that the court erred in denying her motions for a mistrial after witnesses for the State violated the court's order regarding the limits placed on the spanking evidence.

[¶ 22] We review a trial court's decision to deny a motion for a mistrial for an abuse of discretion. *State v. Bridges*, 2004 ME 102, ¶ 10, 854 A.2d 855, 858. We have further stated:

> Because of the superior vantage point of the trial court, we will overrule its decision only for exceptionally prejudicial circumstances or prosecutorial bad faith. Prosecutors have a duty to avoid eliciting inadmissible testimony, and a failure to observe this duty is prosecutorial misconduct that may be sufficient to warrant a mistrial. The trial court should deny a motion for a mistrial except in the rare case when the trial cannot proceed to a fair result and no remedy short of a new trial will satisfy the interests of justice.

*Ardolino*, 1997 ME 141, ¶ 16, 697 A.2d at 79 (citations and quotation marks omitted).

[¶ 23] Allen's argument is not premised on prosecutorial misconduct, i.e., that the prosecution intentionally elicited testimony beyond the scope of the court's order. Rather, Allen argues that the evidence was overemphasized at trial, contrary to the court's instruction, when a State witness referred to "extensive," "inflicted bruises" he saw on Nathaniel, and another witness testified that he was aware that Nathaniel had been spanked.

[¶ 24] Although two State witnesses went beyond the court's limitation, this testimony was merely cumulative of that which the jury already heard. A nurse who treated Nathaniel was permitted to testify that he saw bruising on Nathaniel's buttocks and hips, that Jeremy

---

5. Maine Rule of Evidence 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Allen admitted to him that he had spanked Nathaniel and caused these bruises, and that the boy needed "frequent discipline." Furthermore, two doctors were allowed to testify that in examining Nathaniel, each had seen bruises on the boy's backside. Moreover, as we noted above, the court instructed the jury that Allen did not cause Nathaniel's bruises. *See State v. Naoum*, 548 A.2d 120, 123 (Me.1988) (stating that jurors are presumed to heed a court's curative instruction). Because of the cumulative nature of the objectionable testimony, and the court's curative instruction, Allen was not "exceptionally prejudiced" in such a manner as would render the trial court's decisions to deny her motions for a mistrial acts beyond its discretion.

## C. Sufficiency of the Evidence

[¶ 25] Finally, Allen argues that the evidence was insufficient for the jury to convict her of manslaughter. Specifically, Allen argues that the State failed in its burden of proof because the State did not offer testimony to a reasonable degree of medical certainty regarding the cause of Nathaniel's death.

[¶ 26] In the context of a criminal defendant's argument that the evidence is insufficient to support the conviction, "we review the evidence in the light most favorable to the jury's verdict to determine if the factfinder, acting rationally, could find every element of the offenses beyond a reasonable doubt." *State v. Junkins*, 2002 ME 20, ¶ 12, 789 A.2d 1266, 1269 (citing *State v. Parsons*, 2001 ME 85, ¶ 6, 773 A.2d 1034, 1036). "The weight to be given to the evidence and the determination of witness credibility are the exclusive province of the jury." *State v. Basu*, 2005 ME 74, ¶ 20, 875 A.2d 686, 692 (quoting *State v. Barnard*, 2001 ME 80, ¶ 13, 772 A.2d 852, 858). Any conflicts in evidence are resolved in favor of the State. *State v. Mazerolle*, 614 A.2d 68, 74 (Me. 1992).

[¶ 27] To convict a person of manslaughter, the State must establish that the defendant "[r]ecklessly, or with criminal negligence, cause[d] the death of another human being." 17–A M.R.S. § 203(1)(A). Contrary to Allen's contentions, the evidence was sufficient to convict her of manslaughter. It is undisputed that Allen was alone with Nathaniel on the evening of February 14. Three doctors testified that they believed Nathaniel's injuries occurred during the period of time when he was alone with Allen. Furthermore, numerous doctors concurred that Nathaniel's injuries were consistent with a serious head injury that was almost certainly caused by a violent shaking rather than a fall. Additionally, there was sufficient testimony to refute Allen's defense that Nathaniel had a genetic defect that would have mimicked a traumatic head injury. Given the ample medical testimony about the timing, presentation, and cause of Nathaniel's injuries, there was sufficient evidence to rationally convince a jury that Allen inflicted the injuries that caused Nathaniel's death. *See State v. Benner*, 654 A.2d 435, 437 (Me.1995) (stating that a conviction may be based solely on circumstantial evidence because "[t]he factfinder is allowed to draw all reasonable inferences from the circumstantial evidence").

The entry is:

Judgment affirmed.