MAINE SUPREME JUDICIAL COURT                Reporter of Decisions
Decision:    2017 ME 59
Docket:      Pen-16-96
Argued:      March 3, 2017
Decided:     April 4, 2017

Panel:       SAUFLEY, C.J., and ALEXANDER, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

DUSTIN BROWN

GORMAN, J.

[¶1]  On January 2, 2013, Dustin Brown was indicted for manslaughter (Class A), 17-A M.R.S. 203(1)(A) (2016), to which he pleaded not guilty.  The trial court (Penobscot County, *Anderson, J.*) held a three-day jury-waived trial in November of 2015.  Brown appeals from the judgment of conviction for manslaughter entered after that trial.  He challenges the sufficiency of the evidence supporting his conviction.  We affirm the judgment.

I.  BACKGROUND

[¶2]  The following facts, all of which are supported by the record, were found by the court after trial.  On November 25, 2012, Brown was in his bedroom at his residence in Bangor along with his three-month-old son and the infant's mother.  Sometime before 4:00 p.m. that day, during the infant's

afternoon feeding, the mother gave their son to Brown to care for and left the room to use the bathroom. During the time that Brown was alone in the bedroom with the infant, both the infant's mother and his grandmother, who was in another room in the home, heard the infant "fussing" or crying slightly. Within minutes, Brown came out of the bedroom carrying the infant, who was limp, and told the grandmother there was "something wrong" with the infant. Brown called 9-1-1, and he and the grandmother attempted to resuscitate the infant while they waited for help to arrive. When paramedics arrived at 4:05 p.m., the infant had no pulse and was not breathing. The infant was taken to the hospital, where he was declared dead at 5:30 p.m.

[¶3] Initially, Brown told everyone he spoke with that he had been feeding the infant when the infant suddenly "went limp." Later, Brown told both the infant's mother and his new girlfriend that the infant's head had bumped into his chin and he had instinctively pushed or jerked the infant away from him.

[¶4] By judgment dated January 29, 2016, the court convicted Brown of manslaughter, finding:[1]

---

[1] The court also expressly rejected the defense theory that the infant had aspirated on formula, and found that there was no evidence to incriminate the mother or grandmother, the only other adults in the home at the time the injury was inflicted.

[Brown] caused this traumatic brain injury to his son, most likely by pushing him away very, very aggressively in a way that fits the definition of criminal negligence in that it would involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation. . . . [T]he gross deviation finding [is] based on primarily the expert testimony concerning the degree of force, the amount of force that would be needed in order to cause this result. This isn't the type of treatment that a child gets on a daily basis, because this doesn't happen on a daily basis. This was somewhat unique and it was too forceful and too traumatic to the child and caused the child's death.

[¶5] On February 26, 2016, the court sentenced Brown to twelve years in prison with all but four and a half years suspended and four years of probation. Brown appealed.[2]

## II. DISCUSSION

[¶6] Brown argues that the court erred in convicting him of manslaughter because there was insufficient evidence to prove beyond a reasonable doubt *how* he injured the infant and, therefore, insufficient evidence to establish that his actions were voluntary and met the statutory definition of criminal negligence.[3] In support of his argument, he points to the

---

[2] Brown also filed an application to allow an appeal of his sentence, but his application was denied by the Sentence Review Panel. *See State v. Brown*, No. SRP-16-097 (Me. Sent. Rev. Panel May 13, 2016).

[3] Brown characterizes his appeal as a challenge to the legal or constitutional sufficiency of the judgment rather than the sufficiency of the evidence supporting the judgment. Because the court— which was not required to make any special findings except on request, M.R.U. Crim. P. 23(c)—

4

court's statements that "the State has not proved exactly how this happened" and that Brown injured the infant "in some fashion."

[¶7]    Where an appellant challenges the sufficiency of the evidence supporting a criminal conviction, "we view the evidence in the light most favorable to the State and review any applicable statute de novo to determine whether the fact-finder could have found beyond a reasonable doubt every element of the offense charged." *State v. Murphy*, 2016 ME 5, ¶ 5, 130 A.3d 401. We further recognize that the "fact-finder is permitted to draw all reasonable inferences from the evidence, and decide the weight to be given to the evidence and the credibility to be afforded to the witnesses." *State v. McBreairty*, 2016 ME 61, ¶ 14, 137 A.3d 1012 (quotation marks omitted).

[¶8]    To convict a defendant of manslaughter, the State must prove beyond a reasonable doubt that the defendant acted recklessly or with criminal negligence and caused the death of another person.[4]   17-A M.R.S.

made all the conclusions of law required for a conviction pursuant to 17-A M.R.S. § 203(1)(A) (2016), we address Brown's challenge as one to the sufficiency of the evidence.

   [4] To the extent that Brown argues that his actions were involuntary, we note that the defense of involuntary conduct applies to the actus reus rather than the mens rea of a crime. *See* 1 LaFave, *Substantive Criminal Law* § 6.1(c) at 425-29 (2d ed. 2003); 17-A M.R.S. § 103-B (2016); *State v. Morrison*, 2016 ME 47, ¶ 9, 135 A.3d 343 ("Involuntary conduct is the result of an uncontrolled physical impetus, rather than a state of mind."). We also note that Brown asserts the involuntary conduct defense for the first time on appeal. At trial, he raised only one defense, which the court rejected: that the cause of death was aspiration rather than abusive head trauma. We review issues raised for the first time on appeal for obvious error, *State v. Merchant*, 2003 ME 44, ¶ 15, 819 A.2d 1005, and find no such error here. Although evidence admitted by the State at trial could raise an

§ 203(1)(A); *see also* 17-A M.R.S. § 34 (2016). A defendant acts with criminal negligence with respect to a result of the defendant's conduct—here, the death of an infant—"when [he] fails to be aware of a risk that [his] conduct will cause such a result." 17-A M.R.S. § 35(4)(A) (2016). The defendant's failure to be aware of the risk "must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation." 17-A M.R.S. § 35(4)(C).

[¶9] Contrary to Brown's contention, a criminal conviction is not unsupported by record evidence or violative of due process rights merely because the State did not present direct evidence as to the defendant's *exact* actions in committing the crime, nor is manslaughter uniquely situated among crimes in this respect. In convicting a defendant of manslaughter, the fact-finder may properly find beyond a reasonable doubt that a defendant acted recklessly or with criminal negligence based solely on circumstantial evidence. *State v. Cheney*, 2012 ME 119, ¶ 42, 55 A.3d 473 ("Circumstantial

---

involuntariness defense, the court—in specifically finding that Brown had acted with culpable negligence—determined that the State had disapproved the existence of the defense beyond a reasonable doubt through its expert medical testimony. *See* 17-A M.R.S. § 101(1) (2016) (stating that, where a defense "is in issue as a result of evidence admitted at the trial that is sufficient to raise a reasonable doubt on the issue, . . . the State must disprove its existence beyond a reasonable doubt").

6

evidence alone is sufficient to support a conviction as long as the evidence as a whole supports each element of the crime.").

[¶10]  For instance, in *State v. Allen*, although there was no direct evidence as to how the defendant inflicted the fatal injury, we concluded that a conviction for manslaughter was supported by sufficient record evidence "[g]iven the ample medical testimony about the timing, presentation, and cause of [the toddler's] injuries."  2006 ME 20, ¶¶ 25-27, 892 A.2d 447 (explaining that the State presented evidence that the toddler was alone with the defendant at the time of the injury, the cause of death was consistent with inflicted trauma to the head rather than an accidental fall as the defendant claimed, and the evidence was not consistent with an alternative cause of death posited by the defendant); *see also State v. Chapman*, 496 A.2d 297, 304-05 (Me. 1985)  (upholding a manslaughter conviction based on evidence that the child died of an inflicted brain injury, the defendant was alone with the child at the time the injury had taken place, and the defendant's explanation for the injury was both improbable and inconsistent with the medical evidence, even where there was no direct evidence as to exactly how the defendant inflicted the injury); *State v. Tomer*, 304 A.2d 80, 83-85 (Me. 1973) (upholding a manslaughter conviction based on evidence that the

child died of inflicted injuries where the child was unharmed before the defendant took her into the bathroom but visibly injured after she exited the bathroom, and the fatal injury could have occurred in the timeframe in which she was in the defendant's care, even where there was no evidence as to exactly how the defendant inflicted the injuries).

[¶11]   During this trial, among the witnesses presented by the State were the former Chief Medical Examiner for the State of Maine and the Deputy Chief Medical Examiner for the State of Vermont.  Each had conducted her own independent examination and evaluation, and each testified as to the results of her investigation.  The post-mortem examination by both forensic pathologists revealed that—although he exhibited no external trauma—the infant had subdural, subarachnoid, optic nerve sheath, and retinal hemorrhages.  The pathologists opined that the hemorrhages were caused by acute injuries to the infant's head and that he had died within two hours after being injured.  Neither post-mortem examination revealed any disease or condition that could provide an explanation for the infant's injuries or death. Based on their examinations, their experience, and their expertise, each pathologist determined independently that the cause of death was inflicted traumatic brain injury—the result of a rotational or acceleration-deceleration

type force applied to the infant's head or, perhaps, the impact of the infant's head on a soft surface—which deprived the infant's brain of blood flow and led to cardiac arrest. Both pathologists testified that the force required to cause this injury was greater than that associated with the natural wobbling of an infant's head or a simple bump against a person's chin.

[¶12]   Brown's expert in pathology disagreed with the opinions presented by the State's experts. He opined that the infant died as a result of choking or aspirating on formula.

[¶13]   Thus, as in *Allen*, the fact-finder in the instant case had before it evidence that the cause of death was a traumatic injury to the infant's brain; the injury was inflicted rather than accidental; the injury took place in the timeframe in which Brown was alone with the infant; the infant was well when left alone with Brown but lifeless when Brown emerged with him from the bedroom; and the infant had been "fussing." Moreover, the infant's mother had testified that Brown, in the past, had been frustrated when the infant fussed and often handed him to another person.

[¶14]   Additionally, given that Brown's evolving explanations as to the events leading to the infant's death were inconsistent with the medical evidence and that there was nothing to suggest any alternative suspect, the

evidence established Brown as "the agent of the fatal injury." *Chapman*, 496 A.2d at 305.

[¶15]  Notwithstanding that Brown reported that he acted reflexively and the court found that "this incident occurred somewhat like [Brown] said," the court also expressly found that Brown had acted in a way that meets the definition of culpable negligence—a conclusion supported by competent record evidence.  A rational fact-finder could reasonably infer from the record that, when he was alone with him, Brown handled the infant with such force that the infant sustained subdural, subarachnoid, optic nerve sheath, and retinal hemorrhages, and that Brown's failure to be aware of the risk that his handling of the infant in that manner could produce death was "a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation."  17-A M.R.S. § 35(4)(C); *cf. Allen*, 2006 ME 20, ¶¶ 25-27, 892 A.2d 447.

[¶16]  Although Brown contends that the State was required to present evidence of how a reasonable and prudent person would have acted in handling a small infant because "the standard of conduct is not obvious," the court did not err in resorting to its own common sense in assessing the evidence before it and reaching its conclusion as to culpable negligence. *See*

*State v. Lowe*, 2015 ME 124, ¶ 33, 124 A.3d 156 ("The culpable state of mind required by the statutory definition of manslaughter therefore calls for jurors to resort to their own experiences and common sense in order to identify normative expectations about how 'reasonable and prudent' people should act in a particular situation."). As we have previously noted, "[a] reasonable and prudent person would not forcefully shake a baby because that person would recognize that babies are fragile. Shaking a baby with the degree of force sufficient to cause shaken baby syndrome, therefore, can constitute a gross deviation from a reasonable person's standard of conduct." *In re Ashley M.*, 2000 ME 120, ¶ 10, 754 A.2d 341; *see also State v. White*, 460 A.2d 1017, 1020 (Me. 1983) (noting that "extremely vigorous shaking of a baby can, alone, constitute depraved indifference" and rejecting the defendant's argument "that many persons are not aware that vigorous shaking may be harmful to a baby [and therefore] the ordinary person could hardly have been expected to know that the risk was substantial" (alteration omitted) (quotation marks omitted)).

[¶17] Finally, we note that, to the extent that there was any confusion about the trial court's findings, Brown failed to request further findings of fact pursuant to M.R.U. Crim. P. 23(c). We therefore infer that the trial court found

all the facts necessary to support its judgment given that those inferred findings are supported by evidence in the record.  *See State v. Dodd*, 503 A.2d 1302, 1307 (Me. 1986).

[¶18]  For the reasons stated above, we affirm the judgment.

The entry is:

Judgment affirmed.

---

Jamesa J. Drake, Esq. (orally), Drake Law, LLC, Auburn for appellant Dustin Brown

Janet T. Mills, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2013-17
FOR CLERK'S REFERENCE ONLY