MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2018 ME 100
Docket:      Wal-17-516
Argued:      June 12, 2018
Decided:     July 17, 2018

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

MIRANDA G. HOPKINS

ALEXANDER, J.

[¶1]  Miranda G. Hopkins appeals from a judgment of conviction of manslaughter (Class A), 17-A M.R.S. § 203(1)(A) (2017), entered in the trial court (Waldo County, *R. Murray, J.*) following a jury trial.  Hopkins contends that the court erred in (1) denying her motion to suppress statements she made to law enforcement officers during five different interviews and (2) giving the jury an allegedly confusing instruction on concurrent causation.  Hopkins also challenges the sufficiency of the evidence supporting the jury's conclusion, beyond a reasonable doubt, that Hopkins caused the death of her infant son. We affirm the judgment.

## I. FACTS AND PRETRIAL HISTORY

[¶2]  This statement of the facts and pretrial history includes reference to five different statements that Hopkins made to law enforcement officers at various times.  Those statements were subject to a motion to suppress and are at issue in this appeal.  Viewing the evidence in the light most favorable to the State, the jury, at the trial, and the court, at the motion hearing, rationally could have found the following facts beyond a reasonable doubt.  *See State v. Nobles*, 2018 ME 26, ¶ 2, 179 A.3d 910; *State v. Gerry*, 2016 ME 163, ¶ 2, 150 A.3d 810.

[¶3]  On the morning of January 11, 2017, Miranda Hopkins sent two of her three children—her eight-year-old son and six-year-old son—to school. Hopkins, with her seven-week-old son, then joined a friend and the friend's son for coffee and some shopping.  Hopkins, her friend, and their children returned to Hopkins's home that afternoon to wait for Hopkins's older sons to return home from school.

[¶4]  While waiting for the older boys, Hopkins and her friend drank shots of Fireball whiskey and smoked marijuana.  The older boys arrived home around 3:30 p.m.  After the boys arrived home, Hopkins and her friend each had a couple more shots of Fireball whiskey.  Around 5:30 p.m., Hopkins's cousin

and her cousin's daughter arrived at Hopkins's home for dinner.  About twenty or thirty minutes later, Hopkins's friend and her son left Hopkins's home.

[¶5]  Hopkins had "a few more shots" of Fireball whiskey with her cousin. Hopkins "wasn't counting" but estimated that between 2:30 p.m. and 7:30 p.m. she consumed roughly seven shots of Fireball whiskey, smoked marijuana, and took a Benadryl.

[¶6]  Around 8:00 p.m., Hopkins's cousin and her cousin's daughter left, and Hopkins began her nighttime routine by getting her older boys ready for bed.  While she was helping the older boys, she put the baby in a bouncy seat in the living room.  Hopkins got the boys into their bed and began feeling very "spinny" and "not feeling well at all."  Hopkins lay down at the foot of the older boys' bed and "fell asleep big time."  She awoke much later that night due to a "gall bladder attack."  Hopkins got an ice pack and then lay down in her own bed.  She "wasn't paying attention to anything" as she walked from the older boys' room, into the kitchen, and then into her bedroom.

[¶7]  Hopkins dozed off and then woke up again.  Upon waking up, she reached over and felt the baby's "ice cold" hand.  She testified that the baby was

4

in his "boppy"[1] in an unnatural position and that his head was "wrong." She immediately jumped out of bed, turned on the lights, and grabbed her phone to dial 9-1-1.[2]

[¶8]  At around 1:47 a.m., Hopkins called 9-1-1 and reported that the baby was not breathing, was cold to the touch, and had a big bruise on him. She told the 9-1-1 dispatcher that one of her older boys must have jumped on the baby in the night, but that she had not heard him cry or any other noises. The dispatcher instructed Hopkins to perform cardiopulmonary resuscitation (CPR).

[¶9]  At around 2:06 a.m., a Waldo County Sheriff's deputy arrived at Hopkins's home. She found Hopkins performing CPR on the baby on the floor in her bedroom. The deputy took over CPR and noticed that the baby had a "significant amount of bruising" on his forehead and chest, had scratches on his face and neck, and was stiff and cold. While performing CPR, the deputy contacted her dispatch center and requested that a detective come to investigate.

---

[1]  During the trial, a "boppy" was described as "one of those U-shaped pillows similar to the type of pillow that you will see airline passengers use during their travels."

[2]  This version of events was the version Hopkins told for the first time at trial. Hopkins gave several different accounts of what happened on the night of January 11, 2017, and the early morning of January 12, 2017, to law enforcement officers during several different interviews.

[¶10] Around 2:16 a.m., emergency medical technicians (EMTs) arrived at the home and took over CPR from the deputy. The EMTs brought in an automatic external defibrillator (AED), which is able to sense any cardiac rhythm that is shockable, and attached the paddles to the baby. There was no shockable rhythm, and the EMTs pronounced the baby dead.

[¶11] While the EMTs were working on the baby, the deputy left the bedroom and went into the living room to speak with Hopkins. The deputy advised Hopkins that her baby was dead. Hopkins said that she knew he was gone, mentioned the bruising, and said that she didn't know how the baby got the bruises, but believed that one of the older boys had been responsible. She pointed out her eight-year-old son, sleeping on the couch, to the deputy, then took the deputy down the hall to see her six-year-old son, who was still sleeping in his bed.

[¶12] The deputy explained to Hopkins that, in all child death cases, it was standard procedure to call a detective and that a detective would be arriving shortly. Hopkins then told the deputy about her day, which ended with her and the baby going to bed around 9:00 p.m. As they spoke, the deputy smelled alcohol on Hopkins's breath. The deputy asked Hopkins if she had anything to drink that night. Hopkins told her that she woke up around

11:30 p.m. with gall bladder pain and had a "couple of shots" of Fireball whiskey to help with the pain. Hopkins said that she then went back to bed. She said that she woke up a few hours later, reached over to the baby, and found him cold, stiff, and unresponsive, at which point she called 9-1-1. Hopkins told the deputy that she thought that her oldest son must have killed the baby, but she admitted that she had not heard the baby cry out or felt the bed moving.

[¶13]  Around 3:00 a.m., a Maine State Police detective sergeant arrived at Hopkins's home. Upon the detective sergeant's arrival, the deputy met him outside to brief him on the situation. Upon entering Hopkins's home, the detective sergeant exchanged introductory remarks with Hopkins and then gave her *Miranda* warnings.[3] Hopkins signed a *Miranda* waiver and agreed to participate in a recorded interview.

[¶14]  Hopkins told the detective that she went to bed around 9:00 p.m., then got up around 10:30 p.m. to do the "mommy thing" and check all the doors to make sure they were secure, and then went back to sleep. She said that she woke up later and found the baby cold, bruised, and not breathing. She described herself to the detective as a "light sleeper," but said that the baby had not cried, she did not hear either of the older boys, and neither of the older boys

---

[3]  *See Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

was in her bed when she woke up. She guessed that one of her older boys must have climbed into bed beside her and killed the baby.

[¶15] Hopkins said that she had never seen either of the older boys be aggressive with the baby. She said that the baby had been sleeping "beside [her] like always" in his boppy and that she did not hear either of the older boys come into the room. She also said that she "always" had her three-foot-tall safety gate secured in her bedroom doorway, and that it had been in place that night. She further indicated that neither of the older boys understood how to work the gate.

[¶16] The deputy then returned inside at the request of Hopkins, and the detective went outside. The detective left his recording device on the kitchen table; the device continued to record Hopkins and the deputy as they conversed. Hopkins again told the deputy that her oldest son must have killed the baby. She stated that she was curled up in a ball asleep on her bed and she didn't feel the bed move, but she guessed that one of the boys "climbed over the top of [the baby], like judging by [the baby's] head. Maybe that's why he didn't make a sound." But she also said the safety gate was always secured in her bedroom door and neither of the older boys had ever crawled over the baby in the bed before because they knew it was his spot.

[¶17] After the baby's body was removed from the home, Hopkins agreed to participate in a videotaped walk-through to explain where she and the baby had been positioned in her bed. A detective from the Maine State Police and a sergeant from the Evidence Response Team participated in the videotaped walk-through interview with Hopkins. During this walk-through, Hopkins pointed out the boppy, described the blankets she used to cover the baby up, described her position on her bed, pointed out the safety gate, and explained that the safety gate had been in its position that night.

[¶18] Later that morning at around 7:30 a.m., Hopkins agreed to be further interviewed by the detective who participated in the videotaped walk-through. She met with the detective in his police cruiser because friends and family were arriving at her home. The detective reminded Hopkins that she had been provided *Miranda* warnings during her earlier recorded interview with the detective sergeant, informed her that those rights were still in effect, and offered to go over the rights with her. Hopkins declined the offer to review her *Miranda* rights.

[¶19] Hopkins told the detective that she had two shots of Fireball whiskey around 5:00 p.m., while her cousin was visiting, to "clear her sinuses." She explained that after dinner she got the older boys into bed around 8:00 p.m.

and then put the baby to sleep in his boppy on her bed around 9:00 p.m. She said that she took two hits from a marijuana joint after the older boys had gone to sleep and before she got the baby ready for bed because it "slows [her] brain down long enough that [she] can fall asleep." Hopkins stated that she lay down and fell asleep around 9:00 p.m. and woke up about an hour later because her gall bladder was bothering her. At that time, she checked on the baby and saw that he was fine and still sleeping.

[¶20] Hopkins said that she put a "healthy bruise-free one hundred percent healthy, happy baby to bed . . . ." She did not know what happened to the baby, and she agreed with the detective that the injuries were inflicted by someone but denied that she was responsible. She stated that she was "really praying" that her oldest son would talk to the detective and provide him with the answers he was looking for because one of her older boys was likely responsible, but she acknowledged that she had never seen either of them be violent with the baby.

[¶21] The medical examiner who conducted the autopsy found abrasions and bruises all over the baby's body; skull fractures on both sides of his head and on the back of his head; multiple rib fractures; upper right arm fractures; swelling and bleeding inside the scalp; retinal and optic nerve sheath

10

hemorrhage; and bleeding into the cervical spinal cord.  The medical examiner opined that these injuries were indicative of "whiplash" forces applied to the body and that the rib fractures were likely a result of a "squeezing of the chest" type of force.  The medical examiner determined that the baby's cause of death was blunt force trauma with craniocerebral injuries.[4]

[¶22]  On January 17, 2017, Hopkins was charged by complaint with one count of knowing or depraved indifference murder (Class A), 17-A M.R.S. § 201(1)(A)-(B) (2017).  Thereafter, Hopkins was indicted for manslaughter (Class A), 17-A M.R.S. § 203(1)(A).  After the grand jury indictment, the State dismissed the original murder charge in the complaint.

[¶23]  On April 24, 2017, Hopkins filed a motion to suppress statements she made to law enforcement officers during the course of several interviews. A hearing on the motion was held on August 31, 2017.  At the hearing, Hopkins argued that (1) her initial interview with the responding deputy was in violation of her *Miranda* rights and was involuntary; (2) her interview with the detective sergeant at her kitchen table was undertaken without a valid waiver

---

[4]  At trial, Hopkins introduced the expert witness testimony of a pathologist who reviewed the medical examiner's autopsy report and agreed with the medical examiner's autopsy results and her testimony regarding the baby's injuries.  He further opined that the injuries were most likely caused by multiple, rapid assaults on various different parts of the baby's body and were not the result of a fall or "co-sleeping."

of her *Miranda* rights and was involuntary; and that (3) her second interview with the deputy, (4) her interview during the videotaped walk-through, and (5) her interview with the detective in his cruiser were each undertaken without a reading of her *Miranda* rights and were involuntary. At the hearing, recordings of the interviews were admitted in evidence and the State offered the testimony of the law enforcement officers involved in the interviews.

## II. RULING ON MOTION TO SUPPRESS

[¶24] On October 17, 2017, the court entered a written order on the motion to suppress, granting the motion in part and denying the motion in part.[5] The court made specific findings of fact as to each challenged interview.

[¶25] Regarding Hopkins's initial interview with the deputy, the court found that although no *Miranda* warnings were given, they were not required because the interview "was not a 'custodial' interrogation" and the deputy was responding to a 9-1-1 call initiated by Hopkins. The court found that although Hopkins was crying at points during the interview, for the most part she "was coherent and understandable" and she did not "indicate she wanted to leave or

---

[5] Addressing the five interviews Hopkins challenges on appeal, the court found that the statements made by Hopkins during these interviews did not require suppression. In her motion to suppress, Hopkins also challenged statements made during three other interviews with law enforcement officers, and the court, in its order, made specific findings, some favorable to Hopkins, as to those three interviews. Hopkins is not challenging those rulings.

that she did not want to answer questions." Based on these findings, the court concluded, beyond a reasonable doubt, that Hopkins's statements made to the deputy during the initial interview were voluntary.

[¶26] Addressing Hopkins's interview with the detective sergeant at her kitchen table, the court found that the detective sergeant informed Hopkins "of her *Miranda* rights, and also provided her with a written *Miranda* consent form which she signed." The court also found that the interview was conducted in a "conversational and calm tone." Although Hopkins was crying at times and she was denied the immediate opportunity to smoke a cigarette, the court found that her waiver of her *Miranda* rights was valid and found, beyond a reasonable doubt, that her statements were voluntarily made.

[¶27] The court found that the deputy's second interview with Hopkins occurred "almost immediately after the conclusion of [the detective sergeant's] interview." Although the deputy did not provide Hopkins with new *Miranda* warnings, Hopkins "was allowed to smoke" and "went about various domestic duties" while they conversed. The court found that no new *Miranda* warnings were required for this interview, and that the statements made by Hopkins were voluntary.

[¶28] The court also made specific findings regarding the videotaped walk-through interview. The court found that this interview occurred "approximately three hours after [the detective sergeant] had formally provided the defendant with her *Miranda* warnings" and new *Miranda* warnings were not given. The court found that Hopkins consented to participating in the videotaped walk-through and concluded that although the interview was conducted by different law enforcement officers, new *Miranda* warnings were not required and the statements made by Hopkins, "which were in response to the officer's calm and nonconfrontational inquiries, were voluntary."

[¶29] Addressing Hopkins's interview with the detective in his police cruiser, the court found that no new *Miranda* warnings were given but that the detective "did address *Miranda*" with Hopkins by "telling her that all the *Miranda* rights which had previously been explained to her still apply, and specifically asking her if she needed the officer to go over those again with her." Hopkins said she did not need to go over *Miranda* again. The court found that this interview "lasted approximately three hours" and had a "conversational low-key tone throughout." Hopkins was provided with at least one smoking break, was specifically told she was not under arrest, and at the conclusion of

14

the interview she was not placed under arrest. The court concluded that, based on these circumstances, no new *Miranda* warnings were required and the statements provided by Hopkins during this interview were voluntary.

## III. TRIAL

[¶30]   A five-day trial was held on October 31, 2017, through November 7, 2017. At trial, Hopkins testified on her own behalf. She admitted that much of what she had told law enforcement officers during the interviews that occurred in the aftermath of her baby's death was a lie. Hopkins testified that she lied to the officers during these interviews because she was afraid that her older sons would be taken from her if she admitted that the death occurred while she was passed out from drinking.

[¶31]   At the conclusion of the trial, Hopkins requested a specific concurrent causation instruction, 17-A M.R.S. § 33 (2017), that informed the jurors that, in order to convict her, the State would have to prove three elements beyond a reasonable doubt,[6] including a third element that read: "The

---

[6] *See Maine Jury Instruction Manual*, § 6-50 at 6-91 (2017-18 ed.):

When the defendant's conduct may have operated concurrently with other actions, events or conditions to cause a particular result, then, to find the defendant guilty of the result, the State must prove beyond a reasonable doubt that (1) the result would not have occurred but for the defendant's conduct, and (2) the concurrent cause was not alone clearly sufficient to produce the result and (3) the defendant's conduct was not clearly insufficient to produce the result.

Defendant's conduct was clearly sufficient to produce the result of the death of [her baby]." The court granted Hopkins's request for a concurrent causation instruction but declined to adopt the specific language proposed by Hopkins. Instead, the court gave a concurrent causation instruction with a third element that read: "Miranda Hopkins's conduct was not clearly insufficient to produce the resulting death of [her baby]." Hopkins objected to the court's instruction, and the court responded by stating that it "look[ed] at the language contained in the statute itself on the issue of concurrent causation as it appears in Title 17-A, section 33. And there . . . , the language chosen by the Legislature also uses the term clearly insufficient in addressing the conduct of the defendant as something that, again, must be proven by the State."

[¶32] During its deliberations, the jury sent the court a note requesting clarification on "causation." After consultation with the parties, the court responded by giving further instructions on concurrent causation stating, in part, "to the extent you may find that the conduct of one or more of the older boys was involved in the cause of [the baby's] death, the State must also prove beyond a reasonable doubt that, number one, the boy or boys' actions were not alone clearly sufficient to produce the resulting death of [the baby] and, number two, that Miranda Hopkins's conduct alone was clearly sufficient to produce the

16

resulting death of [her baby]." The concluding sentence of this instruction was similar to the concluding sentence of the instruction that Hopkins had originally requested. Both parties were satisfied with the court's response, and there were no objections.

[¶33] On November 7, 2017, the jury returned a verdict finding Hopkins guilty of manslaughter. Hopkins filed a motion for judgment of acquittal, which was denied on November 28, 2017. Hopkins filed a notice of appeal on November 27, 2017.[7] On December 13, 2017, Hopkins was sentenced to eighteen years in prison, with all but thirteen years suspended, and four years of probation.

## IV. LEGAL ANALYSIS

A. Motion to Suppress

[¶34] Hopkins argues that the court erred in denying her motion to suppress the statements that she made to law enforcement officers during the five interviews because (1) Hopkins's initial interview with the deputy constituted a custodial interrogation requiring the deputy to inform Hopkins of her *Miranda* rights; (2) Hopkins's interview with the detective sergeant was

---

[7] Because a sentence had not yet been entered at the time the appeal was filed, the appeal was interlocutory, and we allowed the trial court to enter a final judgment and deemed the appeal to be from the final judgment.

undertaken without a valid waiver of her *Miranda* rights; (3) Hopkins's *Miranda* rights were required to be reread during her second interview with the deputy, the videotaped walk-through interview, and the interview with the detective in his cruiser; and (4) Hopkins's statements made during all five interviews were not voluntary because of her emotional distress when she made the statements.

[¶35]  When addressing a challenge to a court's denial of a motion to suppress, "we review the factual findings underlying the trial court's ruling for clear error and the court's legal conclusions de novo." *State v. Cote*, 2015 ME 78, ¶ 9, 118 A.3d 805.  We will affirm a court's denial of a motion to suppress if any reasonable view of the evidence supports the court's decision.  *State v. Marquis*, 2018 ME 39, ¶ 15, 181 A.3d 684.

1.  Whether Hopkins's Statements in her Initial Interview With the Deputy Were Made During a Custodial Interrogation

[¶36]  "When a person has been subjected to an in-custody interrogation but has not been advised of his *Miranda* rights, the State may not offer the statements made during that interrogation against that person in its case-in-chief."  *State v. Perry*, 2017 ME 74, ¶ 15, 159 A.3d 840; *see Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966).  A defendant is considered "in custody" when subject to either a formal arrest or a restraint on freedom of movement to the degree associated with formal arrest.  *See State v. Michaud*, 1998 ME 251,

¶ 4, 724 A.2d 1222. "To determine if a person was in custody for *Miranda* purposes, a court must objectively review the pertinent circumstances to decide whether a reasonable person in the defendant's position would have felt free to terminate the interaction with law enforcement or if there was a restraint on freedom of movement of the degree associated with formal arrest." *Perry*, 2017 ME 74, ¶ 15, 159 A.3d 840.

[¶37] In making this determination, we consider a number of factors, viewing them in their totality, including:

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or nonexistence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7) whether the suspect was questioned in familiar surroundings;

(8)     the number of law enforcement officers present;

(9)     the degree of physical restraint placed upon the suspect; and

(10)    the duration and character of the interrogation.

*Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222.

[¶38]   Review of these factors establishes that Hopkins was not in custody at any point during her initial interview with the deputy. Hopkins initiated this interview seeking help following the 9-1-1 call concerning her baby. Hopkins was coherent and understandable during the interview, the interview occurred in her home, the deputy was the only officer involved during this interview, and the conversation maintained a "calm tone" throughout. There was no point at which a reasonable person in Hopkins's position would have felt that she was not free to terminate the interrogation and leave. S*ee State v. Bragg*, 2012 ME 102, ¶ 8, 48 A.3d 769. The court did not err in concluding that Hopkins was not in custody for purposes of *Miranda*.

    2.     Whether Hopkins Validly Waived her *Miranda* Rights During her Interview With the Detective Sergeant

[¶39] If an individual is determined to be "in custody," the State then has the burden of proving that the statements were obtained after a knowing, intelligent, and voluntary waiver of *Miranda* rights. *State v. Coombs*, 1998 ME 1,

¶ 15, 704 A.2d 387.   To constitute a valid waiver of *Miranda* rights, a defendant's conduct must amount to an "intentional relinquishment or abandonment of a known right or privilege." *State v. Gordon*, 387 A.2d 611, 612 (Me. 1978).   "Whether a defendant has validly waived her *Miranda* rights depends on the factual circumstances of the interrogation."   *Coombs*, 1998 ME 1, ¶ 13, 704 A.2d 387.

[¶40]   Hopkins was given *Miranda* warnings at the beginning of her second interview—the interview with the detective sergeant in her kitchen— and validly waived *Miranda*.  After introductory remarks, the detective sergeant informed Hopkins of her *Miranda* rights and provided her with a written *Miranda* consent form, which she signed.   Although Hopkins was crying at times, she was coherent and understandable for the majority of the interview. The court did not err in concluding, based on the totality of the circumstances, that Hopkins's waiver of her *Miranda* rights was knowing, voluntary, and intentional.

    3.    Whether *Miranda* Warnings Needed to be Reread Before Hopkins's Second Interview With the Deputy, the Videotaped Walk-Through Interview, or the Interview With the Detective in his Police Cruiser

[¶41]   When the interrogation process is resumed after an interruption, *Miranda* warnings may need to be reread for statements to be admissible.

*State v. Birmingham*, 527 A.2d 759, 761-762 (Me. 1987). Several objective factors are examined to determine whether an accused must be re-informed of her constitutional rights:

(1)   the time lapse between the last *Miranda* warnings and the accused's statements;

(2)   interruptions in the continuity of the interrogation;

(3)   whether there was a change of location between the place where the last *Miranda* warnings were given and the place where the accused's statements were made;

(4)   whether the same officer who gave the warnings also conducted the interrogation resulting in the accused's statement; and

(5)   whether the statement elicited during the complained of interrogation differed significantly from other statements which had been preceded by *Miranda* warnings.

*State v. Myers*, 345 A.2d 500, 502 (Me. 1975); *see State v. Drake*, 1999 ME 91, ¶ 4, 731 A.2d 858.

[¶42] Hopkins's contention that *Miranda* warnings should have been reread during the second interview with the deputy, the videotaped walk-though interview with the detective, and the interview conducted with the detective in his police cruiser, is unavailing. These three interviews took place shortly after Hopkins received *Miranda* warnings and validly waived them, they occurred consecutively and reasonably close in time to one another,

and they occurred either in Hopkins's home or right outside her home. Further, Hopkins was reminded of her *Miranda* rights when she was interviewed by the detective in his police cruiser, the last of the interviews at issue, but declined the detective's offer to review her *Miranda* rights. The court did not err in determining that *Miranda* warnings did not need to be repeated before these interviews.

4.    Whether Hopkins's Statements Were Voluntary

[¶43]  When a voluntariness issue is raised, the State has the burden to prove beyond a reasonable doubt that a statement was voluntary. *State v. Kittredge*, 2014 ME 90, ¶ 24, 97 A.3d 106. We review the court's factual findings regarding voluntariness for clear error and its ultimate determination regarding voluntariness de novo. *State v. Hunt*, 2016 ME 172, ¶¶ 16-19, 151 A.3d 911; *State v. Bryant*, 2014 ME 94, ¶ 15, 97 A.3d 595.

[¶44]  To determine whether a statement was voluntary, we consider the totality of the circumstances and consider factors "such as: the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's

age, physical and mental health, emotional stability, and conduct." *State v. Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d 1173.

[¶45] Here, the totality of the circumstances supports the conclusion that Hopkins's statements to law enforcement officers during the five challenged interviews were voluntary. The questioning that occurred throughout the five interviews was nonconfrontational and most of the interviews took place in Hopkins's home, with the exception of the interview with the detective that occurred in his police cruiser in front of Hopkins's home. Although Hopkins was crying at times during the interviews, Hopkins was coherent and understandable during the interviews. There was no evidence that any of the law enforcement officers coerced or tricked Hopkins to get her to talk. The court did not err in finding, beyond a reasonable doubt, that Hopkins's statements during all five interviews were voluntary.

B.    Jury Instruction on Concurrent Causation

[¶46]   Hopkins argues that the court erred by giving a concurrent causation instruction that confused the jurors. We review jury instructions as a whole for prejudicial error to ensure that they accurately and fairly informed the jury of the law and to determine the potential for a juror misunderstanding as a result of the instructions. *See State v. Okie*, 2010 ME 6, ¶ 8, 987 A.2d 495.

We will not vacate a judgment based on the denial of a proposed jury instruction unless the appealing party can demonstrate that the instruction "(1) stated the law correctly; (2) was generated by the evidence in the case; (3) was not misleading or confusing; and (4) was not sufficiently covered in the instructions the court gave." *State v. Hanaman*, 2012 ME 40, ¶ 16, 38 A.3d 1278. "A trial court has wide discretion in formulating its instructions to the jury so long as it accurately and coherently reflects the applicable law." *State v. Martin*, 2007 ME 23, ¶ 6, 916 A.2d 961. "When jury instructions closely parallel the provisions of the Maine Criminal Code, they are adequate to provide the jury with the necessary information." *State v. Mann*, 2005 ME 25, ¶ 13, 868 A.2d 183.

[¶47] Title 17-A M.R.S. § 33 provides that "[u]nless otherwise provided, when causing a result is an element of a crime, causation may be found where the result would not have occurred but for the conduct of the defendant operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant was clearly insufficient."

[¶48] Reviewing the instructions as a whole, the court informed the jury correctly and fairly of all necessary elements of the governing law on

concurrent causation. Although Hopkins's requested instruction stated the law correctly, was generated by the evidence, and was not misleading or confusing, the trial court's slightly different instruction mirrors the "clearly insufficient" statutory language, and was adequate to provide the jury the necessary information about the elements of concurrent causation. *See* 17-A M.R.S. § 33; *Mann*, 2005 ME 25, ¶ 13, 868 A.2d 183.

[¶49]  Additionally, upon receiving a note from the jury asking for clarification on "causation," the court responded by giving a clarifying instruction that used language similar to the language that Hopkins originally requested.  The court did not err in instructing the jury on concurrent causation.

C.    Sufficiency of the Evidence

[¶50]  Hopkins argues that there was not sufficient evidence to prove beyond a reasonable doubt that she "[r]ecklessly, or with criminal negligence, cause[d] the death" of her baby.  *See* 17-A M.R.S. § 203(1)(A).

[¶51]  On a challenge to the sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the State and determine whether a trier of fact rationally could find beyond a reasonable doubt each element of the offense charged.  *State v. McBreairty*, 2016 ME 61,

¶ 14, 137 A.3d 1012. The jury may draw all reasonable inferences from the evidence presented at trial and decide issues of the weight and credibility of the evidence. *Id.*

[¶52] Direct evidence of a defendant's exact actions in committing a crime is not required; the fact-finder "may properly find beyond a reasonable doubt that a defendant acted recklessly or with criminal negligence based solely on circumstantial evidence." *See State v. Brown*, 2017 ME 59, ¶ 9, 158 A.3d 501. A conviction based on circumstantial evidence may be affirmed even if the inferences drawn from circumstantial evidence are contradicted by parts of the direct evidence. *State v. Cummings*, 2017 ME 143, ¶ 12, 166 A.3d 996; *State v. Medeiros*, 2010 ME 47, ¶ 17, 997 A.2d 95.

[¶53] To convict Hopkins of manslaughter, 17-A M.R.S. § 203(1)(A), the State was required to prove beyond a reasonable doubt that she acted recklessly or with criminal negligence and caused the death of her baby. *See* 17-A M.R.S. § 35(3), (4)(A) (2017). In addition, the State was required to prove beyond a reasonable doubt that the death would not have occurred but for Hopkins's conduct operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant was clearly insufficient. *See* 17-A M.R.S. § 33.

[¶54]  Assessing the evidence in the light most favorable to the State, the jury, based on the evidence presented, could have found that the baby was home with Hopkins and Hopkins's two older sons at the time of his death, the baby's cause of death was consistent with severe inflicted trauma rather than an act of a sleeping person or falling, and the evidence was not consistent with the alternative cause of death asserted by Hopkins—that her older boys were responsible for the baby's death.  *See State v. Allen*, 2006 ME 20, ¶¶ 25-27, 892 A.2d 447 (holding that there was sufficient evidence supporting the defendant's manslaughter conviction where the State presented evidence that the toddler was alone with the defendant at the time of injury, the cause of death was consistent with inflicted trauma rather than an accidental fall as the defendant claimed, and the evidence was not consistent with an alternative cause of death advanced by the defendant).  The evidence was sufficient to support Hopkins's conviction of manslaughter.

The entry is:

Judgment affirmed.

Laura P. Shaw, Esq. (orally), Camden Law LLP, Camden, for appellant Miranda G. Hopkins

Janet T. Mills, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Waldo County Unified Criminal Docket docket number CR-2017-47
FOR CLERK REFERENCE ONLY